**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

THOMAS PATRICK SULLIVAN, aka
Seal B,
          *Defendant-Appellant.*

No. 06-50710

D.C. No.
CR-04-01697-
GAF-2

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

THOMAS EDWARD RUBIN, aka
Seal A,
          *Defendant-Appellant.*

No. 06-50714

D.C. No.
CR-04-01697-
GAF-1

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

GEOFFREY C. MOUSSEAU,
          *Defendant-Appellant.*

No. 07-50087

D.C. No.
CR-04-01697-
GAF-3

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
January 9, 2008—Pasadena, California

Filed April 11, 2008

3791

Before: Jerome Farris and Milan D. Smith, Jr.,
Circuit Judges, and H. Russel Holland,* District Judge.

Per Curiam Opinion

---

*The Honorable H. Russel Holland, Senior United States District Judge for the District of Alaska, sitting by designation.

## COUNSEL

Vicki I. Podberesky, Esq., Nasatir, Hirsch, Podberesky & Genego, Santa Monica, California, for defendants-appellants Thomas Rubin and Thomas Sullivan.

Michael D. Rounds and Cassandra P. Joseph, Watson Rounds, Reno, Nevada, for defendant-appellant Geoffrey Mousseau.

Ranee A. Katzenstein and Paul G. Stern, United States Attorney's Office, Los Angeles, California, for the plaintiff-appellee.

## OPINION

PER CURIAM:

Thomas Sullivan, Thomas Rubin, and Geoffrey Mousseau appeal their convictions and sentences for mail, wire, and bankruptcy fraud, money laundering, and conspiracy to commit fraud and money laundering. The defendants contend that (1) the evidence is insufficient to support the convictions, and (2) the government created a prejudicial variance between the indictment and proof at trial. Mousseau further contends that his trial should have been severed, and that the prosecutor engaged in misconduct. We have jurisdiction over defendants' timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

## Background

Thomas Rubin and Thomas Sullivan were the Chief Executive Officer and Chief Financial Officer, respectively, of

Focus Media, Inc., a Santa Monica, California-based advertising agency. Geoffrey Mousseau is an attorney who represented Focus in bankruptcy proceedings and other business matters.

Focus was in the advertising placement business. The agency placed commercial advertisements on television and radio for clients including Sears Roebuck & Co., 20th Century Fox, and Universal City Studios, Inc. Focus' services included booking air time for its clients' commercials, tracking whether the commercials reached their desired audience, and negotiating compensation with stations when advertisements failed to air or reach their promised audience.

After commercials aired, media stations sent an invoice to Focus, and Focus in turn invoiced its advertising clients. Focus billed its clients for the actual cost of the air time and charged a fee for its additional services. Focus' clients were expected to pay within 30 days of receipt of an invoice. Focus in turn paid the media stations 90 days after the commercial broadcast date. This procedure allowed clients to avoid writing hundreds of checks to the individual stations that aired the commercials, and Focus had the benefit of the 60-day "float" on which it could earn interest.

The record reflects that none of the foregoing was documented by agreements between Focus and its clients or Focus and the media. Media stations considered both Focus and Focus' clients to be liable for the cost of air time purchased, but the clients relied upon Focus to pay the stations.

Focus' business thrived for much of the 1990's. But in 1999, Focus lost three of its four major accounts when 20th Century Fox, DreamWorks, and Universal Studios stopped doing business with the agency. Universal Studios cited as reasons for terminating its account, Focus' failure to deliver promised savings and poor record of placing advertisements that reached the company's target audience. In the summer of

1999, Focus' last major client, Sears, expressed concern that Focus was not paying media stations in a timely manner and cut the fee it paid Focus. Sears fired Focus on March 14, 2000.

By the end of 1999, Focus was laying off employees and was insolvent. Focus' cash-flow was limited by its dwindling client base and CEO Rubin's practice of borrowing from Focus. From 1996 to 1999, Focus disbursed $16 million in shareholder loans to Thom Rubin & Associates, Rubin's d/b/a.

In early 2000, Focus failed to pay media stations for advertising time it purchased on behalf of Universal Studios and Sears during the fourth quarter of 1999. Both clients remitted funds to Focus to pay the cost of their advertising in late 1999, but Focus transferred just a fraction of this money to the media outlets. Of the approximately $34 million that Sears remitted to Focus to cover its fourth quarter advertising costs, Focus paid $10.5 million to media outlets and retained more than $23 million. Focus failed to pay Warner Brothers' affiliates more than $7 million, NBC more than $400,000, and ABC more than $900,000 owed for Sears' advertisements. Rubin and Sullivan offered several excuses to the media stations for the unpaid invoices, including that Focus was not obligated to pay because the stations had contacted Sears and Universal Studios directly and that Universal Studios never remitted funds to Focus to pay for its advertisements.

In January 2000, Rubin and Sullivan began disbursing Focus' funds to private accounts under their control. In March 2000, Sears filed a civil suit against Focus in California superior court alleging, *inter alia*, conversion and breach of contract. Sears obtained a preliminary injunction enjoining Focus from spending its funds. Universal Studios obtained a similar preliminary injunction against Focus in May 2000.

Despite these court orders, from March to July 2000, Rubin and Sullivan transferred more than $16 million from Focus'

accounts to Thom Rubin & Associates. Focus forgave the $16 million in shareholder loans that the agency had made to Thom Rubin & Associates. Rubin used more than $10 million of these funds to pay his personal taxes. The money also financed a $250,000 credit balance on a corporate American Express credit card in the names of Rubin and Sullivan. Rubin continued to use the corporate card after he quit Focus in July 2000. In 2000, Rubin received more than $18 million in cash from Focus. Focus lost almost $9 million that year.

Still unpaid, NBC, ABC, and Paxson Communications, Inc. filed an involuntary bankruptcy petition against Focus on October 6, 2000, triggering an automatic stay of the California proceedings under 11 U.S.C. § 362.[1] Rubin had retained Mousseau to represent him personally on September 27, 2000, but Mousseau began to work on Focus' bankruptcy case.[2] Mousseau had experience in business litigation, employment law, and transactional work, but had no bankruptcy experience.

On October 26, 2000, Sears filed a motion to appoint an interim trustee to take possession of Focus' remaining assets and preserve them during the bankruptcy proceedings. The same day, Focus retained the law firm Stutman, Treister & Glatt as bankruptcy counsel. The firm agreed to represent Focus, but insisted that Focus' funds not be used to pay its retainer. (The state court injunctions were still in place.)

On October 26 and 27, Sullivan disbursed approximately $1.2 million from Focus' accounts to himself, Rubin, Mousseau, Rubin's corporate American Express Card, and

---

[1]For details of Focus' bankruptcy litigation, see *Focus Media, Inc. v. Nat'l Broad. Co. (In re Focus Media, Inc.)*, 378 F.3d 916 (9th Cir. 2004).

[2]Mousseau claimed that he was personally retained by Rubin and Sullivan in a February 2002 declaration submitted during Focus' bankruptcy proceedings. Mousseau's claim was inconsistent with his prior representations that he was solely Rubin's attorney.

other third parties. Sullivan transferred $500,000 from Focus to Mousseau's client trust account. Mousseau later used these funds to pay Stutman's retainer. In so doing, Mousseau told Stutman partner Theodore Stolman that the funds came from Rubin, who had earlier deposited them in Mousseau's client trust account. Stutman was not informed of Sullivan's other disbursements.

At 4 p.m. on October 27, 2000, the bankruptcy court granted Sears' motion and appointed an interim trustee. When the trustee sought an accounting of Focus assets that had been sold or transferred within the past year, Mousseau did not report the $500,000 that Sullivan transferred to his client trust account. Rubin and Sullivan did not report the transfers made from Focus' accounts to their private accounts on October 26 and 27.

In December 2000, Stolman learned of Sullivan's October 26 and 27 disbursements and Stutman terminated its representation of Focus. In September 2001, the bankruptcy court granted a partial summary judgment in favor of Focus' creditors. We affirmed this decision in 2004. *See In re Focus Media*, *Inc.*, 378 F.3d at 931.

## Criminal Proceedings

On October 26, 2005, Rubin and Sullivan were indicted for conspiracy, mail fraud, wire fraud, and money laundering in connection with the alleged misappropriation of client funds owed to media outlets. Rubin, Sullivan, and Mousseau were indicted for bankruptcy fraud stemming from the disbursement of Focus' funds during the involuntary bankruptcy proceedings.

The government charged Rubin with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371; mail fraud in violation of 18 U.S.C. § 1341; four counts of wire fraud in violation of 18 U.S.C. § 1343; wire fraud involving

the deprivation of honest services, in violation of 18 U.S.C. §§ 1343 and 1346; conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. § 371; seventeen counts of bankruptcy fraud in violation of 18 U.S.C. § 152; and two counts of money laundering in violation of 18 U.S.C. § 1957. Sullivan was charged under the same counts and one additional count of money laundering. The government charged Mousseau with seventeen counts of bankruptcy fraud and one count of conspiracy to commit bankruptcy fraud.

Prior to trial, the district court denied a motion from Mousseau to sever the counts related to Rubin and Sullivan's alleged defrauding of Focus' clients and the media outlets. On June 19, 2006, a jury convicted Rubin on all counts except one count of wire fraud and one count of bankruptcy fraud. Sullivan was convicted on all counts except one wire fraud count. Mousseau was convicted on five counts of bankruptcy fraud and one count of conspiracy to commit bankruptcy fraud, and was acquitted on the remaining charges.

The defendants filed post-trial motions for acquittal and for a new trial. The district court denied the motions for a new trial and the motions for acquittal on all but one count, granting Rubin and Sullivan's acquittal motion for deprivation of honest services. On December 6, 2006, the defendants were sentenced and ordered to pay restitution.

## I

Rubin and Sullivan challenge their convictions for mail and wire fraud (Counts 2-4, 6), conspiracy to commit mail and wire fraud (Count 1), fraudulent bankruptcy transfers (Counts 11-22), and false declarations in bankruptcy (Count 23), arguing the evidence submitted at trial was insufficient to support the jury's verdict. Rubin, Sullivan, and Mousseau claim there was insufficient evidence to sustain their convictions for concealment of bankruptcy assets (Counts 9 and 10), withholding of information from the interim trustee (Count 26), and con-

spiracy to commit bankruptcy fraud (Count 8). Sullivan and Mousseau raise sufficiency of the evidence challenges to their convictions for false declarations in bankruptcy (Counts 24 and 25).[3]

"Claims of insufficient evidence are reviewed de novo." *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004). There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

### A: Counts 2, 3, 4, and 6

**[1]** The elements of mail and wire fraud are: (1) proof of a scheme to defraud; (2) using the mails or wires to further the fraudulent scheme; and (3) specific intent to defraud. *See* 18 U.S.C. §§ 1341, 1343. "The Supreme Court has interpreted § 1343 broadly and twice held that individuals who retain or misappropriate the money or property of others, regardless of how they acquired it, fall within the purview of mail or wire fraud." *United States v. Jones*, 472 F.3d 1136, 1139 (9th Cir. 2007). "It is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). Intent may be inferred from misrepresentations made by the defendants, *see United States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir. 1992), and the scheme itself may be probative circumstantial evidence of an intent to defraud. *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990).

Rubin and Sullivan argue that the evidence established neither the existence of a scheme to defraud nor that they had specific intent to defraud their clients. They contend that cli-

---

[3] Sullivan and Mousseau were charged in Count 24 but only Mousseau was charged in Count 25.

ent funds remitted to Focus constituted Focus' income and that they were not obligated to use these funds to pay their clients' media bills. Noting that Sears and Universal Studios commercials aired during the fourth quarter of 1999, they argue that their clients received the benefit of what they paid for. They claim the government's remaining evidence merely points to a civil dispute between Focus and media outlets over payments.

**[2]** Rubin and Sullivan's argument ignores evidence that Focus' clients relied on Focus to pay media stations for their advertisements. Sears executive Mark Cohen and Universal Studios executive Mark Kristol testified that their companies hired Focus in part to pay the individual media stations that broadcast their advertisements. Cohen, Kristol, and Debra Stover, Sears' comptroller for marketing, testified that their companies remitted funds to Focus on the understanding that they would be used to pay the media bills referenced on Focus invoices. The government produced Focus invoices to Sears and Universal Studios itemizing the media bills that client funds were used to pay.

**[3]** Assuming, *arguendo*, that Focus was not obligated to pay its clients' media bills, the company still was required to pay media outlets for advertising time it purchased, as Rubin and Sullivan acknowledge. Focus was insolvent at the end of 1999. Instead of paying off Focus' media company creditors, Rubin and Sullivan disbursed client funds earmarked for the media outlets to their private accounts. The government offered evidence that Rubin and Sullivan repeatedly misrepresented why they could not pay their clients' advertising bills when media stations tried to collect payment in early 2000. Their basic scheme—bill Focus' clients for aired advertisements, then disburse remitted funds to their private accounts instead of to the media outlets—falls within the Supreme Court's broad interpretation of fraudulent activity under §§ 1341 and 1343. *See Jones*, 472 F.3d at 1139-40.

**[4]** Rubin and Sullivan contend that they lacked specific intent to defraud at the time they used the mails to invoice Sears and Universal Studios for advertisements broadcast in the fourth quarter of 1999. This argument is meritless. The government established beyond a reasonable doubt that beginning in December 1999, Rubin and Sullivan failed to pay media outlets for Sears and Universal Studios advertisements and misrepresented why they did not pay for their clients' advertisements. From January to July 2000, they appropriated funds from Focus' accounts receivable for their personal use. This provided sufficient circumstantial evidence from which the jury could find that Rubin and Sullivan specifically intended to defraud their clients and the media outlets when the invoices were mailed.[4] Rubin and Sullivan's subsequent fraudulent appropriation of funds also satisfies the intent requirements of §§ 1341 and 1343 for Counts 3, 4, and 6, which involved wire transfers of Sears funds to Focus in December 1999 and January 2000. *See Jones*, 471 F.3d at 1140 ("Although . . . Jones did not possess a fraudulent intent when he received the money, his fraudulent appropriation of the funds still satisfies the elements of § 1343."). There is sufficient evidence to uphold Rubin and Sullivan's convictions on the mail and wire fraud charges.[5]

---

[4]Rubin and Sullivan cite *United States v. Starr*, 816 F.2d 94, 99-100 (2d Cir. 1987), for the proposition that intent to defraud does not exist where the client obtains the benefit of the bargain and suffers no harm. Here, both Focus' clients and the media outlets suffered significant financial harm. Sears lost $8 million and Focus owed more than $25 million to media outlets named in the indictment. Rubin and Sullivan's reliance on *Starr* is misplaced.

[5]Rubin and Sullivan contend that if there is insufficient evidence to support their mail and wire fraud convictions, their convictions for money laundering (Counts 27-29) must also be reversed since the government alleged that the money laundered was the product of mail and wire fraud. This is the only argument Rubin and Sullivan raise with respect to Counts 27-29. Therefore, by affirming the jury's verdict on the mail and wire fraud charges, we also affirm Rubin and Sullivan's money laundering convictions.

## B:   Count 1

Rubin and Sullivan submit that the evidence was insufficient to convict them for conspiracy to commit mail and wire fraud.

"To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime."[6] *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (citation and internal quotation marks omitted). "The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *Id.* (citing *United States v. Romero*, 282 F.3d 683, 687 (9th Cir. 2002)).

**[5]** The government introduced sufficient evidence to sustain the conviction on the conspiracy charge. The evidence indicates that Rubin and Sullivan both knew of the scope of the conspiracy. From January to March 2000, both men misrepresented why Focus could not pay media outlets for the Sears and Universal Studios advertisements, at the same time they were transferring funds from Focus' accounts receivable to their personal accounts. Sullivan authorized the illicit transfers of which Rubin had knowledge. The evidence supports the jury's verdict on the conspiracy to commit mail and wire fraud count.

## C:   Counts 9, 10

Rubin, Sullivan, and Mousseau argue that evidence submitted at trial was insufficient to support the jury's verdict on the

---

[6]Consistent with our conclusion that the evidence of intent is sufficient for the mail and wire fraud counts, the evidence of intent is sufficient for the conspiracy charge.

concealment of bankruptcy assets counts. The counts involved two $250,000 wire transfers from Focus to Mousseau's client-trust account on October 26 and 27, 2000, funds that were later used to pay Stutman and other law firms.

[6] Concealment of bankruptcy assets requires the government to prove that the defendants knowingly and fraudulently concealed property of the bankruptcy estate from the trustee. 18 U.S.C. § 152(1). "Concealment . . . need not consist of secretly appropriating funds for one's own use. It is sufficient if one withholds knowledge of assets about which the trustee should be told." *United States v. Weinstein*, 834 F.2d 1454, 1462 (9th Cir. 1987) (citation omitted). A violation of § 152(1) can exist where the concealment of funds from the bankruptcy estate occurred before the appointment of the trustee. *See, e.g.*, *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1255 (1st Cir. 1991) (transfers made nine months before a bankruptcy proceeding were sufficient to show a violation of § 152(1)).

[7] Rubin, Sullivan, and Mousseau argue that they disclosed Focus as the source of the funds and that they did not knowingly conceal funds from the interim trustee. A rational juror could have concluded otherwise. The government introduced evidence that Stutman informed the appellants that it would not accept Focus funds to pay its retainer. Stolman, the Stutman partner who handled Focus' communications with the interim trustee, testified that Mousseau told him that Rubin was the source of the retainer funds. On the cover page of a December 8, 2000 fax, Mousseau asserted to Stolman that the funds used to pay Stutman's retainer came from his client trust account and not directly from Focus.[7] In January

---

[7]Mousseau contends that this statement cannot support an intent to conceal because the fax, on a subsequent page, disclosed that the funds originated with Focus. While Mousseau argued this theory to the jury, the jury was entitled to disbelieve his explanation. *See Weinstein*, 834 F.2d at 1462.

2002, Sullivan and Mousseau declared that the funds were transferred to Mousseau's client trust account pursuant to Sullivan's indemnification agreement with Focus, despite evidence that Mousseau did not represent Sullivan in his personal capacity. These misrepresentations are evidence of appellants' efforts to conceal Focus' assets from the trustee. *See Lothian*, 976 F.2d at 1267-68. Stolman further testified that portions of a December 8, 2000 fax from Mousseau that allegedly disclosed Focus as the source of the funds were illegible. In addition, neither Mousseau nor Sullivan disclosed the $500,000 transfers to the interim trustee.

Mousseau asserts that evidence of intent is lacking because funds that pass through a client trust account are readily traceable. This argument fails. We have held that an "easily traceable" transfer can still show intent to conceal under § 152(1). *See Weinstein*, 834 F.2d at 1462. In addition, Mousseau's contention that a debtor may use its funds to hire an attorney before the trustee is appointed does not negate the intent to conceal. So long as an intent to conceal assets from the trustee may be inferred from the evidence, the government has met its burden under § 152(1).

Mousseau's contentions that he was not Focus' bankruptcy attorney and that he corresponded with the interim trustee to the best of his ability are not well taken. Mousseau chose to represent Focus in its bankruptcy proceedings despite having no experience in this highly specialized practice area. Even an inexperienced attorney should have known to report the $500,000 transfers to the interim trustee. Mousseau knowingly involved himself in Rubin and Sullivan's scheme and assisted in the concealment of Focus' assets. His lack of experience in bankruptcy law is not a shield from criminal liability.

[8] Rubin argues that he lacked the requisite intent to prove concealment because he had no knowledge of the October 2000 wire transfers. He notes that he resigned from Focus

three months before the transfers took place. The government introduced billing records from Zelle Hofmann Voelbel Mason & Gette, LLP, another law firm retained by Focus, indicating that Rubin took part in decisions regarding Focus' response to the October 6 involuntary bankruptcy petition. Stolman also testified that Rubin called him on December 9, 2000 in an effort to persuade Stutman not to withdraw as Focus' bankruptcy counsel. Even if Rubin was not directly involved in the wire transfers, a rational juror could have found that the transfers were reasonably foreseeable to him as part of the conspiracy to commit bankruptcy fraud charged in Count 8. *See infra* Section I-G. Under *Pinkerton v. United States*, 328 U.S. 640 (1946), a conspirator is "criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002) (citing *Pinkerton*, 328 U.S. at 645-48). Rubin's participation in strategy sessions to respond to the involuntary bankruptcy petition support an inference that he could have foreseen the transfers. The evidence is sufficient to uphold the defendants' convictions for concealment of bankruptcy assets.

## D:   Counts 11-22

Rubin and Sullivan argue there is insufficient evidence that they made fraudulent bankruptcy transfers on October 27 and November 20, 2000, contending the transfers were made to pay routine business expenses and without the intent to defraud. We reject the argument.

To prove a violation of 18 U.S.C. § 152(7), the government must show that the defendants knowingly and fraudulently transferred or concealed property "with intent to defeat the provisions of title 11." 18 U.S.C. § 152(7). Intent may be established through circumstantial evidence. *See United States v. McCormick*, 72 F.3d 1404, 1406 (9th Cir. 1995).

**[9]** The record shows that Rubin and Sullivan caused eleven checks to be drawn on Focus accounts on October 27, disbursing funds to Rubin, Sullivan, Rubin's adult children, Rubin's corporate credit card, and Rubin's personal physician, among other recipients. The bankruptcy court appointed the interim trustee at 4:00 p.m. that day. Stolman testified that Sullivan and Mousseau were aware of Sears' ex parte application to appoint an interim trustee on October 26. Zelle, Hofmann billing records showed that Rubin, Sullivan, and Mousseau held meetings on how to respond to the filing throughout the day. Peter Anderson, counsel for the interim trustee, testified that Sullivan and Mousseau did not provide the interim trustee with the location of Focus' bank accounts until the eleven checks had already cleared. As of December 7, 2000, Rubin and Sullivan had not revealed to the trustee all of Focus' banking records. Their actions prevented the interim trustee from taking full possession of Focus' assets. *See* 11 U.S.C. § 303(g). There was sufficient evidence from which the jury could find the fraudulent intent required to convict Rubin and Sullivan under 18 U.S.C. § 152(7).

## E:   Count 23

Sullivan and Mousseau challenge their convictions for false declaration in a bankruptcy proceeding on the ground that the statements they made to the bankruptcy court were not false. Rubin challenges his conviction for aiding and abetting a false declaration made by Sullivan, arguing that he had no role in the statement.

To prove a violation of 18 U.S.C. § 152(3), the government must establish beyond a reasonable doubt "(1) the existence of the bankruptcy proceedings; (2) that a statement under penalty of perjury was made therein, or in relation thereto; (3) that the statement was made as to a material fact; (4) that the statement was false; and (5) that the statement was knowingly and fraudulently made." *United States v. Lindholm*, 24 F.3d 1078, 1082-83 (9th Cir. 1994).

**[10]** In an October 27, 2000 declaration submitted in opposition to the appointment of an interim trustee, Sullivan told the bankruptcy court that pending the resolution of the involuntary bankruptcy case, Focus intended to make ordinary business expenditures and would preserve and protect the company's assets. As noted *supra* in Section I-D, that day, Sullivan authorized the disbursement of $700,000 of Focus' funds in a severance package to himself, Rubin, Rubin's adult children, and others. A rational juror could have found beyond a reasonable doubt that Sullivan's statement to the court was knowingly false. A rational juror could also have convicted Rubin for aiding and abetting the statement. Rubin participated in several meetings with Sullivan and Mousseau where they prepared declarations in response to Sears' motion to appoint an interim trustee. *Cf. McCormick*, 72 F.3d at 1410-11 (holding evidence of false statement was insufficient where an appellant signed a bankruptcy petition without reading it).

In a January 28, 2002 declaration, Sullivan asserted that the $500,000 disbursement from Focus to Mousseau's client trust account was transferred pursuant to Sullivan's indemnification agreement with Focus. The government established that the principal recipients of these funds, Mousseau and Stutman, never identified themselves as Sullivan's counsel. Sullivan's declaration is also at odds with testimony he delivered under oath on January 15, 2002, stating that he was unfamiliar with the indemnification agreement and had no legal expenses stemming from Focus' bankruptcy. In light of these discrepancies, a rational juror could infer that Sullivan's declaration was false. *See, e.g.*, *United States v. Magallon-Jimenez*, 219 F.3d 1109, 1114 (9th Cir. 2000) ("It is the province of the trier of fact 'to . . . resolve evidentiary conflicts, and draw reasonable inferences from proven facts.' ") (citation omitted).

There is sufficient evidence to affirm Mousseau's false statement conviction in connection with the indemnification agreement. Mousseau claimed that the Focus funds were dis-

bursed to his client trust account pursuant to Sullivan's indemnification agreement at a bankruptcy hearing to determine whether Mousseau violated 11 U.S.C. § 329, which requires bankruptcy attorneys to disclose the compensation they receive from debtor-clients. Mousseau's assertion contravened his earlier representation to Stolman that the funds originated with Rubin. Anderson also testified that Mousseau defied an April 14, 2002 order from the bankruptcy court to face cross-examination over inconsistent statements he had made concerning his bankruptcy compensation.

**[11]** The evidence also supports the jury's finding beyond a reasonable doubt that Mousseau made a false declaration when he testified that he never told Stolman that he paid Stutman's retainer with his own funds. Mousseau's December 8, 2000 fax to Stolman expressly stated that "as you can see by comparing the timing of the retainer check to when I received transfers from Focus, the money used for the retainer was mine." Mousseau contends that his full testimony establishes that his declaration was truthful. He explained that the money used to pay Stutman's retainer originated with Focus, but was initially transferred to his client trust account in order to comply with Stutman's request that the retainer not be paid directly by Focus. The jury was entitled to disbelieve this explanation. *See Weinstein*, 834 F.2d at 1462.

### F:   Count 26

Rubin, Sullivan, and Mousseau assert the evidence is insufficient to uphold their conviction for withholding information from the interim trustee. The record refutes the argument.

A conviction under 18 U.S.C. § 152(9) requires the government to establish that a defendant knowingly and fraudulently withheld information relating to the property of the debtor from a trustee after the filing of title 11 proceedings. 18 U.S.C. § 152(9).

**[12]** The defendants argue that they did not intentionally withhold information and that their efforts to provide records to the trustee were hampered by an exodus of Focus employees after the trustee was appointed. The record indicates otherwise. On October 28, 2000, the day after the appointment of the trustee, Focus employees used a computer data deletion program to erase financial information in Focus' computer system. Stolman and Anderson testified that Sullivan and Mousseau provided incomplete bank and accounting records, despite repeated requests for information. Tom Jeremiassen, a forensic accountant working for the trustee, testified that Sullivan misrepresented the identity of the party who filed Focus' tax returns, delaying his effort to compile company accounting records. A rational juror hearing this evidence could have concluded that the defendants fraudulently withheld information from the trustee.

## G:  Count 8

**[13]** Rubin, Sullivan, and Mousseau submit there is insufficient evidence in the record to support their conviction for conspiracy to commit bankruptcy fraud.[8] A rational juror could infer an agreement between the co-defendants from the October 27, 2000 disbursements of Focus funds to Rubin, Sullivan, and Mousseau and their subsequent efforts to conceal Focus' assets from the interim trustee. The government presented evidence that Rubin, Sullivan, and Mousseau met several times in late October to discuss the involuntary bankruptcy and argued the conspiracy was agreed to at these meetings. Mousseau notes the government presented no direct evidence that illegal activities were discussed at these meetings and submits that the evidence was insufficient to estab-

---

[8]"To prove conspiracy under 18 U.S.C. § 371, the government must establish (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *Montgomery*, 384 F.3d at 1062. *See supra* Section I-B.

lish an agreement between him and his co-defendants. We have recognized that " 'the existence of an agreement may be inferred from circumstantial evidence.' " *United States v. Moreland*, 509 F.3d 1201, 1218 (9th Cir. 2007) (quoting *United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (en banc)); *see also United States v. Castro*, 972 F.2d 1107, 1110 (9th Cir. 1992) ("The government does not have to present *direct* evidence. Circumstantial evidence and the inferences drawn from that evidence will sustain a conspiracy conviction.") (emphasis in original). Given Mousseau's role in facilitating the transfer of Focus funds and in concealing Focus' assets, the jury could reasonably infer that he joined an agreement to commit bankruptcy fraud.

**[14]** The government introduced ample evidence of acts to implement the agreement, including Sullivan's disbursements of Focus' funds to Rubin, Mousseau, and himself on the eve of the appointment of a trustee, and Focus' failure to respond to the trustee's attempts to locate the agency's bank accounts. The testimony of Anderson and Stolman showed that the defendants provided incomplete accounting records and failed to identify the location of Focus' bank accounts until checks they had drawn on Focus' account had already cleared. Viewing the evidence in the light most favorable to sustaining the jury's guilty verdict, there was sufficient evidence from which a reasonable jury could find the defendants guilty beyond a reasonable doubt of conspiracy to commit bankruptcy fraud.

## II

Rubin and Sullivan argue that there was a variance between the mail and wire fraud charges alleged in the indictment and the proof at trial that requires reversal.

We review de novo allegations of a material variance. *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006).

"A material variance exists if a materially different set of facts from those alleged in the indictment is presented at trial, and if that variance affects the defendant's 'substantial rights.' " *Id.* at 1146 (quoting *United States v. Adamson*, 291 F.3d 606, 615-16 (9th Cir. 2002)).

The defendants contend there was a variance between the indictment, which alleged that they agreed to misappropriate payments from Sears and Universal Studios when they invoiced these clients in late 1999, and the government's closing argument, where prosecutors argued that they decided to "hedge their bets" with Sears by paying some of their client's fourth quarter advertising bills and retaining the rest of Sears' funds until the company decided whether it would keep its Focus account. There was no variance. As the government notes, the indictment alleged that the defendants misappropriated only a portion of the funds Sears remitted for its fourth quarter advertisements. The government's theory required proof of the same set of facts charged in the indictment.

**[15]** This case is unlike *Adamson*, where the government charged the defendant with one misrepresentation in the indictment and offered proof of a different misrepresentation at trial. *See Adamson*, 291 F.3d at 615. Here, the pertinent fact is that at the time the invoices were mailed to Sears and Universal Studios, Rubin and Sullivan did not intend to use most of the funds remitted to pay the media outlets for their clients' advertising bills. The government alleged this conduct in the indictment and offered proof of it at trial. The record does not support a claim of variance. *See Bhagat*, 436 F.3d at 1146-47.

## III

Mousseau argues that the district court erred by denying his pre-trial motion to sever, pursuant to Federal Rule of Criminal Procedure 14.

We review a denial of a motion for severance for an abuse of discretion. *United States v. Pitner*, 307 F.3d 1178, 1181

(9th Cir. 2002). "The test for abuse of discretion by the district court is 'whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial.' " *United States v. Decoud*, 456 F.3d 996, 1008 (9th Cir. 2006) (internal citation and quotation omitted).

**[16]** Mousseau failed to renew his severance request at the close of evidence. The parties agree that failure to renew a severance request generally waives appellate review. "It is well-settled that the motion to sever 'must be renewed at the close of evidence or it is waived.' " *United States v. Alvarez*, 358 F.3d 1194, 1206 (9th Cir. 2004) (quoting *United States v. Restrepo*, 930 F.2d 705, 711 (9th Cir. 1991)). However, we have identified exceptions to the renewal requirement where the defendant "can show either that he diligently pursued severance or that renewing the motion would have been an unnecessary formality." *Decoud*, 456 F.3d at 1008. Mousseau seeks to come within this exception by claiming the district court made clear that it would not entertain further argument on the severance issue in its denial of his pre-trial motion. This argument lacks support in the record. The district court addressed Mousseau's severance argument a second time in its order denying Mousseau's post-trial motion for acquittal and a new trial. Mousseau does not qualify for an exception to our renewal requirement. His severance claim is waived.

Even if not waived, Mousseau's severance argument would fail on the merits. Mousseau claims he was prejudiced by his joint trial with Rubin and Sullivan. In reviewing the prejudicial effect of a joint trial, we consider the factors enumerated in *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004).**⁹** The most important factors are whether the jury can

---

**⁹**These factors are "(1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evi-

compartmentalize the evidence against each defendant and the judge's diligence in providing evidentiary instructions to the jury. *Id.* Although Mousseau was named in Counts 8 through 26, the jury acquitted him on thirteen counts of bankruptcy fraud for which Rubin and Sullivan were convicted (Counts 11-23). The jury's selective verdicts against Mousseau demonstrate that his case received individual consideration. *See United States v. Baker*, 10 F.3d 1374, 1387 (9th Cir. 1993) (observing that "the best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts.") (citation and quotation marks omitted), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000). Mousseau's severance argument is meritless.

## IV

Mousseau's final claim is that the prosecutor engaged in misconduct by referring to him as a liar in closing argument and suppressing evidence that showed he disclosed Focus as the origin of the funds in his client trust account.

Mousseau did not object at trial to these acts of alleged misconduct. Accordingly, he must show that the district court plainly erred when it did not sua sponte address the alleged misconduct. *United States v. Weatherspoon*, 410 F.3d 1142, 1150-51 (9th Cir. 2005). "When prosecutorial misconduct is alleged, 'the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000)

---

dence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether Appellants could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Fernandez*, 388 F.3d at 1241.

(citation omitted). "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *Id.*

**[17]** Mousseau contends that the prosecutor committed misconduct by stating in closing argument that he "lied or misled the bankruptcy court" and "[told] lies to bankruptcy counsel, Ted Stolman." This argument fails. While the prosecutor's comments qualify as "hard blows," they were a fair inference from facts showing that Mousseau misrepresented the source of the funds used to pay Stutman's retainer to the bankruptcy court and Stolman. *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (based on reasonable inferences, prosecutors may argue in closing argument that one side is lying).

Mousseau also argues that the prosecutor impermissibly withheld a more legible copy of Mousseau's December 8, 2000 fax showing that Focus was the source of the funds in his client trust account. His contention lacks record support. The government introduced into evidence the "more legible" fax through the testimony of Anderson, making it available to defense counsel for cross-examination and in closing argument. The record further indicates the relevant portions of the "more legible" fax are also illegible to the naked eye. The prosecutor's conduct was not improper.

**AFFIRMED**.