**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
               *Plaintiff-Appellee,*

    v.

LUIS KAIPAT PELISAMEN,
           *Defendant-Appellant.*

No. 10-10022

DC No.
1:08 cr 01-ARM 2

OPINION

Appeal from the District Court
for the Northern Mariana Islands
Alex R. Munson, Chief District Judge, Presiding

Argued and Submitted
February 17, 2011—Honolulu, Hawaii

Filed April 13, 2011

Before: A. Wallace Tashima, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Tashima

**COUNSEL**

Douglas Cushnie, Esq., Saipan, MP, for the appellant

Kirk W. Schuler, Esq., Assistant United States Attorney, Saipan, MP, for the appellee

---

**OPINION**

TASHIMA, Circuit Judge:

The United States Supreme Court has recently held that the offense of honest-services fraud codified at 18 U.S.C. § 1346 is unconstitutionally vague when applied to conduct other than bribery and kickbacks. *Skilling v. United States*, 130 S.Ct. 2896, 2931 (2010). In this case, we must decide whether a conviction for wire fraud remains valid where the language of the indictment and the evidence offered by the government support a "money or property" theory of fraud, where the jury was instructed on both a "money or property" theory and an honest-services theory, and where the jury returned a special verdict form indicating that it had convicted the defendant on both theories. We hold that the "money or property" fraud conviction remains valid.

## I. BACKGROUND

Defendant-Appellant Luis Pelisamen ("Defendant"), was convicted of wire fraud in connection with the unauthorized removal of funds from his grandmother's estate, of which he was the administrator. Rita Kaipat ("Rita"), Defendant's grandmother, died in 1959. Her estate included a parcel of real property that was taken in eminent domain by the Marianas Public Land Authority ("MPLA"), without compensation, in 1991 or 1992. In 1994, the Superior Court for the Commonwealth of the Northern Mariana Islands ("Superior Court") determined that this property was actually held by Rita as customary trustee for herself and the other heirs of

Vicenta Kaipat ("Vicenta"), presumably Rita's mother, but possibly her stepmother or other relative.[1]

In December 2003, Defendant was appointed administrator of Rita's estate. After Defendant's appointment, he and his attorney at the time, Timothy Bellas ("Bellas"), negotiated with the MPLA for the overdue compensation for the land that had been taken in eminent domain. Following an initial offer of $100,000, Defendant succeeded in securing compensation in the significantly higher amount of $4.4 million. In May 2005, the $4.4 million in compensation was received from the MPLA and deposited into an account at the Bank of Guam that had been established by Bellas in the name of the estate. That fall, the Superior Court issued a Partial Decree of Distribution for Vicenta's estate, which divided the $4.4 million award three ways, with approximately $1.365 million going to the estate of Rita (Defendant's grandmother) and $1.365 million going to each of the estates of two other heirs of Vicenta. The Superior Court also awarded Defendant $161,500 in fees for his services as administrator of the estate.

Prior to the issuance of that decree, Defendant had terminated Bellas as his attorney and hired Joseph Arriola ("Arriola") to replace him. Bellas controlled the account that held the $4.4 million in Vicenta's estate and was responsible for distributing the one-third shares to each of Vicenta's heirs. Bellas established a new bank account at the Bank of Guam to hold the $1.365 million due to Rita's estate and gave Defendant's new attorney Arriola access to those funds by adding him as a signatory to that account. In November 2005, Arriola depleted that account by obtaining a cashier's check for the funds in Rita's estate (now increased to $1.377 million, including accumulated interest). The request for the cashier's check that Arriola submitted to the Bank of Guam included an acknowledgment and consent signed by Defen-

---

[1]Defendant disputes that Vicenta was actually Rita's mother, but that question is of no import to our decision.

dant. The Bank of Guam then initiated a wire transfer of those funds to a new account at the Bank of Hawaii that had been set up by Arriola. Arriola added Defendant as a signatory to this new account shortly after it was established.

Per a Superior Court order issued in April 2006, Rita had five heirs, including Defendant's mother, each of whom was entitled to approximately $273,000. The $273,000 due to Defendant's mother was subject to further division between her five heirs, one of whom was Defendant. Thus, Defendant ultimately was entitled to an inheritance of $54,682. Between December 2005 and May 2006, however, Defendant and Arriola removed a total of $625,775 from Rita's estate, by writing a series of checks drawn on the Bank of Hawaii account that were signed by both of them. Checks totaling $348,500 were written to Defendant. Another $20,075 was taken out of the estate's account to pay a car dealership for a 2005 Nissan Frontier that Defendant had purchased. Checks totaling an additional $38,000 were written to Defendant's wife, and another $219,200 was given to Arriola.

In January 2008, both Defendant and Arriola were indicted of one count of conspiracy to commit wire fraud, one count of wire fraud, one count of conspiracy to commit money laundering, and two counts of money laundering.[2] Defendant was convicted on all counts.[3] After his motion for a new trial was denied, the district court sentenced Defendant to sixty months' imprisonment on each count, to be served concurrently, plus restitution in the amount of $626,775. Defendant timely appealed.

---

[2]The money laundering charges were based on the issuance of two separate checks to the car dealership for Defendant's new car, as described above.

[3]Defendant was tried twice, his first trial having ended in a mistrial due to a hung jury.

## II.  ANALYSIS

### A.  Jurisdiction

We have jurisdiction pursuant to 28 U.S.C. § 1291 (granting jurisdiction over appeals from all final decisions of the District Court of Guam), and 48 U.S.C. § 1824 (applying "[t]hose portions of Title 28 which apply to . . . the District Court of Guam" to the District Court for the Northern Mariana Islands).

### B.  The Impact of *Skilling*

The indictment charged Defendant with the commission of wire fraud in violation of 18 U.S.C. § 1343 and specified that such wire fraud was for the purposes of "obtaining money and property." The indictment does not mention 18 U.S.C. § 1346, which provides that the behavior punishable under § 1343 includes a scheme or artifice "to deprive another of the intangible right of honest services." Nonetheless, the district judge instructed the jury that it could convict Defendant if it found that he had *either* (1) "defrauded the heirs of the Estate of Rita Kaipat," *or* (2) "deprived the heirs . . . of their right to honest services," *or* (3) done both. The verdict form permitted a conviction on the wire fraud charge if the jury found Defendant guilty of a scheme or plan to defraud the heirs "and/or" a scheme or plan to deprive them of honest services. The jury checked the boxes for both forms of fraud.

After Defendant had been convicted, the Supreme Court decided *Skilling*, in which it held that the honest-services fraud codified in 18 U.S.C. § 1346 is unconstitutionally vague when applied to conduct other than bribery and kickbacks. Defendant now argues that the holding in *Skilling* renders the jury's verdict constitutionally infirm.

#### 1.  Standard of Review

The proper standard of review for this claim merits some discussion. Defendant did not object to the jury instructions

in the district court. Generally, a failure to object to jury instructions means that appellate courts may review the instructions only for "plain error that affects substantial rights." Fed. R. Crim. P. 52(b); *see* Fed. R. Crim. P. 30(d). The plain-error standard applies even if, as is the case here, there were no legal grounds for challenging the instructions at the time they were given, but such legal grounds have since arisen due to a new rule of law arising between the time of conviction and the time of appeal. *See Johnson v. United States*, 520 U.S. 461, 464-68 (1997). The plain-error standard of review dictates that reversal is warranted only where there has been (1) error; (2) that is plain; (3) that affects substantial rights; and (4) where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 466-67; *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008).

Generally, the defendant bears the burden of persuasion on the third prong (affects substantial rights) of the plain-error test. *See Olano*, 507 U.S. at 741. Defendant argues, however, that the burden of persuasion shifts to the prosecution when, as is true in this case, the error was not clear at the time of the conviction, but a supervening decision renders it so by the time of appeal. The Second Circuit has held that the burden does shift in these sorts of cases. *United States v. Viola*, 35 F.3d 37, 42 (2d Cir. 1994), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997).

This circuit has not adopted the *Viola* burden-shifting rule and contrary to Defendant's assertion, the framework has not been adopted in other circuits either. *See United States v. Gonzalez-Huerta*, 403 F.3d 727, 734-35 (10th Cir. 2005) (noting that the Supreme Court in *Johnson* had an opportunity to apply and endorse the *Viola* "presumed prejudice" rule and did not do so); *United States v. Kramer*, 73 F.3d 1067, 1074 n.17 (11th Cir. 1996) (declining to follow *Viola*); *see also Lowery v. United States*, 3 A.3d 1169, 1174 (D.C. 2010)

(describing *Viola* as "one exception of uncertain authority" to the rule that defendant bears the burden of persuasion on prejudice). Moreover, the Second Circuit itself has acknowledged that the Supreme Court may have implicitly overruled *Viola* by not shifting the burden in *Johnson*, which also involved a new rule of law rendering jury instructions invalid after conviction, but before appeal. *See United States v. Williams*, 399 F.3d 450, 457 n.7 (2d Cir. 2005).

We need not decide who bears the burden of persuasion in circumstances such as in this case where there has been an intervening decision between the time of conviction and the time of appeal. As we explain below, we are confident that Defendant's substantial rights were not affected under either standard, and that the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.

## 2. Merits

**[1]** As noted, the Supreme Court held in *Skilling* that a defendant may not be convicted of honest-services fraud, except in cases involving bribes or kickbacks. 130 S.Ct. at 2931. Thus, Defendant argues that the first two prongs of the plain error test are easily met. The government argues, however, that the district court in this case committed no error because Arriola received kickbacks from Defendant for conspiring with him to steal money from Rita's estate. We reject this argument. Black's Law Dictionary defines a "kickback" as a "*return* of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." *Black's Law Dictionary* (9th ed. 2009) (emphasis added). The indictment nowhere mentions the term kickback or the concept of Defendant redirecting any funds to Arriola once he had received them. Moreover, Defendant never *returned* any money to Arriola because he never received any money from him. All of the stolen money was taken from Rita's estate. The government's case has always been that Defendant and Arriola acted together to withdraw funds that belonged to Rita's estate and

its heirs. In contrast, the paradigmatic kickback is made "for the purpose of improperly obtaining or rewarding favorable treatment" in some area (*e.g.*, government contracts). 41 U.S.C. § 52(2). The Supreme Court's analysis in *Skilling* strongly suggests that what it meant by "kickbacks" was precisely this paradigmatic situation. 130 S.Ct. at 2927, 2930-31.

**[2]** As there were no bribes or kickbacks alleged, the incorporation of honest-services fraud into the jury instructions and jury verdict form was plainly erroneous under *Skilling*. *See Johnson*, 520 U.S. at 467-68. Therefore the first two prongs of the plain-error test are met.

The next question is whether the error affected substantial rights, which in most cases is an inquiry into whether it was "prejudicial" — that is, whether it "affected the outcome of the [trial] court proceedings." *Olano*, 507 U.S. at 734.[4] We answer that question in the negative. Defendant's wire fraud conviction is not dependent on his conviction under an honest-services theory.

**[3]** As the Supreme Court observed in *Skilling*, the crime of honest-services fraud was initially created by courts to cover situations in which "the victim's loss of money or property [did not supply] the defendant's gain," 130 S.Ct. at 2926 — in other words, to cover cases of fraud that are more complex or subtle than those in which the defendant steals money or tangible property from the victims. This is clearly not such a case. Here, the allegation is that Defendant's actions directly deprived Rita's other heirs of their money. The district court instructed the jury that they must convict if they found *either* that Defendant had "defrauded" the heirs, *or* that he had "deprived the heirs . . . of their right to honest services," *or* that he had done both. The instructions do not clarify that "de-

---

[4]Certain errors may affect substantial rights without being prejudicial, *see, e.g.*, *Olano*, 507 U.S. at 735, but Defendant does not argue that this error falls into that category.

frauding" must involve the taking of money or property from the victims. However, the alleged appropriation of the victims' money was implied in this instruction, given that the entire basis of the indictment was that Defendant had helped himself to money that did not belong to him.

**[4]** The district court also gave the jury a special verdict form that asked the jury to specify the theory of liability under which it had convicted Defendant by marking a line next to the jury's chosen theory or theories. The jury form provided:

> If you voted guilty, indicate what theory or theories of liability you relied upon, as described in Jury Instruction No. 15:
>
> ____ Scheme or plan to defraud the heirs of the Estate and/or
>
> ____ Scheme or plan to deprive the heirs of the Estate of their honest services.

The jury checked both lines. This choice clearly indicates that the conviction was based on a valid "money or property" theory of wire fraud, as well as the invalid "honest services" theory, and, therefore, remains valid. *See Hedgpeth v. Pulido*, 129 S.Ct. 530, 532 (2008) (per curiam) ("An instructional error arising in the context of multiple theories of guilt [does not] vitiate [ ] *all* the jury's findings . . . ."); *cf. Yates v. United States*, 354 U.S. 298, 312 (1957) (a verdict may be set aside "where the verdict is supportable on one ground, but not on another, *and it is impossible to tell which ground the jury selected*") (emphasis added), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

*Black v. United States*, 130 S.Ct. 2963 (2010), which the Court decided on the same day as *Skilling*, provides further guidance on how to address this issue. In *Black*, the government had similarly argued alternative theories of money-or-

property fraud and honest-services fraud. Unlike in this case, however, only a general verdict form was provided to the jury, which made it impossible to discern the theory on which it convicted the defendant. *See* 130 S.Ct. at 2966. The case was remanded by the Court to the Seventh Circuit, which concluded that, notwithstanding the general verdict, the fraud convictions would remain valid if it was "not open to reasonable doubt that a reasonable jury would have convicted [the defendants] of pecuniary fraud." *United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010). This test is met here. The indictment focuses on how Defendant and Arriola worked together to take *money* from Rita's estate. A key exhibit relied upon by the government shows the amounts of money to which the heirs of Rita were entitled and compares those amounts to amounts actually received or receivable after Defendant's and Arriola's withdrawals. And, most tellingly, the special verdict form indicates that the jury did convict on the basis of a theory other than honest-services fraud.[5]

[5] Under the fourth prong of the plain-error test, we may reverse the conviction only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. It is true that the use of the term "defraud" in the jury instructions and jury verdict form without a reference to money or property is less than ideal. But it does not tilt the equities in favor of reversal, given how obvious it is that this is a case of pecuniary fraud. The Supreme Court's holding in *Skilling* was intended to foreclose as unconstitutional convictions for fraud based on acts such as undisclosed self-dealing

---

[5]In the wake of *Skilling*, several district courts have also considered cases involving special verdict forms providing for conviction on either a pecuniary fraud theory or an honest-services theory, similar to that used here. Those courts have concluded, as we do here, that convictions for mail or wire fraud remain valid, as long as the special verdict form shows that the jury found the defendant guilty on the pecuniary fraud theory. *United States v. Muoghalu*, 2010 WL 3184178, at *11 n.3 (N.D. Ill. Aug. 9, 2010); *United States v. Allen*, 2010 WL 2813767, at *2 (N.D. Ind., Jul. 15, 2010).

or conflicts of interest. *Skilling*, 130 S.Ct. at 2932. The Court certainly did not intend for that holding to call into question convictions clearly based on the theft of money, such as in this case.

**[6]** Because the error did not affect Defendant's substantial rights, nor did it affect the fairness, integrity, or public reputation of judicial proceedings, there was no "plain error that affect[ed Defendant's] substantial rights." Fed. R. Crim. P. 52(b).

## C.   Defendant's Remaining Contentions

We conclude that the other bases of Defendant's appeal are without merit.

### 1.   Presentation of false testimony

Defendant's motion for a new trial was premised in part on the assertion that the government presented false testimony by Defendant's former attorney Bellas. We review the district court's denial of that motion for abuse of discretion. *See United States v. Moses*, 496 F.3d 984, 987 (9th Cir. 2007). The district court should have granted a new trial if: (1) the prosecution actually presented false testimony; (2) the prosecution knew or should have known that the testimony was false; and (3) the false testimony was material to the outcome of the trial. *See Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010).

**[7]** Here, Bellas' testimony does not rise to the level of perjury, nor do we find that the government knew or should have known that it was false. At trial, Bellas testified that, in September 2005, he had transferred the one-third share of Vicenta's estate that belonged to Rita's estate to Defendant's control by personally handing a check to Arriola in a parking lot. In fact, however, bank records indicate that Bellas actually created a new account in the name of Rita's estate at the

Bank of Guam, with both himself and Arriola as signatories, and deposited the money into a time certificate of deposit in this account. Bellas was testifying in June 2009 about administrative matters that he had handled in September 2005 — almost four years earlier. His testimony regarding the transfer of funds was frequently qualified by the phrases "to my recollection" or "[m]y recollection is . . .", and he admitted that he did not remember exactly when the transfer occurred. The government theorizes, quite plausibly, that what Bellas was remembering was handing Arriola not a check but the time certificate of deposit into which he had placed Rita's share of the Vicenta estate. The district court's implicit conclusion that Bellas did not intentionally perjure himself is therefore well-supported.

It is also highly unlikely that the government knew or should have known that it was offering false testimony. The documents establishing that the funds were moved not by check, but by the creation of a new account, were presented into evidence only when the defense called as its witness a vice president of the Bank of Guam, who delivered those documents in response to a defense subpoena. When those documents were presented, the government's attorney protested that he had just seen them for the first time "five minutes ago," and Defendant's attorney also stated that this was his first time seeing them. Nothing in the record supports an inference that the government knew that Bellas' testimony about how the money transfer was made was "false."

### 2. *Brady* violation

Defendant also makes the related argument that he is entitled to a new trial because the government failed to disclose the documents showing that Bellas' account of how he transferred the money to Arriola was incorrect and thereby violated the rule, set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the

evidence is material either to guilt or to punishment." *Id.* at 87. The *Brady* rule applies to evidence impeaching a government witness, as well as to evidence that is directly exculpatory. *See United States v. Bagley*, 473 U.S. 667, 676 (1985).

While the standard of review for a trial court's denial for a motion for a new trial is generally abuse of discretion, review is *de novo* when the asserted basis for a new trial is a *Brady* violation. *See United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009); *United States v. Howell*, 231 F.3d 615, 624 (9th Cir. 2000). A *Brady* violation has occurred if: (1) the government willfully or inadvertently suppressed; (2) evidence favorable to the accused; and (3) prejudice ensued. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Hein*, 601 F.3d at 906. The suppression of evidence need not have been knowing or negligent behavior on the part of the government. *See, e.g.*, *id.* But the evidence must have been suppressed. The defendant "bears the initial burden of producing some evidence to support an inference that the government possessed or knew about" the *Brady* material. *Price*, 566 F.3d at 910.

**[8]** Defendant has not met that initial burden here. As discussed above, the record clearly indicates that both the government and Defendant's attorney were surprised by the disclosure at trial of the bank records indicating that Bellas' account of how the money got from him to Arriola was inaccurate. Nothing in the record suggests that these records were possessed by or known to any agent of the government at any point before Bellas testified. Rather, it was Defendant who possessed the records and introduced them into evidence at trial.

### 3. Sufficiency of evidence

Defendant argues that the government failed to prove the elements of wire fraud, which is the predicate crime to his money laundering conviction. We review the district court's denial of Defendant's motion for judgment of acquittal for

plain error. *See United States v. Lowry*, 512 F.3d 1194, 1198 n.3 (9th Cir. 2008).[6]

Defendant was convicted of wire fraud in violation of 18 U.S.C. § 1343. The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) specific intent to defraud. *See Sullivan*, 522 F.3d at 974. Defendant's signature appears above Arriola's on virtually all of the checks that were written to himself, to his wife, to Arriola, and to the car dealership out of the money in Rita's estate. The wire transfer affording federal criminal jurisdiction over the case is the November 2005 transfer of the $1.37 million that belonged to Rita's estate from the account established by Bellas at the

---

[6]Ordinarily, a claim that a conviction is not supported by sufficient evidence is reviewed by this court *de novo*, *see United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008), and the conviction is upheld if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). However, the claim is subject to *de novo* review only if the defendant has adequately preserved the issue for appeal. *See Lowry*, 512 F.3d at 1198 n.3.

Here, Defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29(a) at the close of the government's evidence, but he did not make an additional Rule 29 motion at the close of all evidence, nor was the issue raised in his motion for a new trial. The weight of authority in this circuit is that a Rule 29 motion made at the close of the government's evidence must be renewed at the end of trial or in a written post-trial motion, or else plain error review applies. *See United States v. Gonzalez*, 528 F.3d 1207, 1210-11 (9th Cir. 2008); *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1200-01 (9th Cir. 2000); *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1010 (9th Cir. 1995). *But see United States v. Esquivel-Ortega*, 484 F.3d 1221, 1224-25 (9th Cir. 2007); *United States v. Stewart*, 420 F.3d 1007, 1014 (9th Cir. 2005). In any event, the distinction is largely academic, given that, whether review is de novo or for plain error, we must give great deference to the jury verdict and "must affirm if any rational trier of fact could have found the evidence sufficient." *Vizcarra-Martinez*, 66 F.3d at 1010.

Bank of Guam to the new account at the Bank of Hawaii.[7] The transfer was initiated by a letter to the Bank of Guam from Arriola requesting release of the funds; that letter described "consultation with my client Luis K. Pelisamen" and bore Defendant's signature on an acknowledgment and consent.

**[9]** "It is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). The conclusion that Defendant intended to defraud the estate is supported by sufficient circumstantial evidence: the series of checks bearing his and Arriola's signatures, and phone records indicating that Defendant and Arriola were frequently in touch by phone on the days when many of the checks were written.

**[10]** Defendant's conviction for conspiracy to commit wire fraud required the jury to find: (1) an agreement to engage in criminal activity, which need not be explicit; (2) one or more overt acts taken to implement the agreement; and (3) requisite intent to commit the underlying offense. *See Sullivan*, 522 F.3d at 976. Only one overt act in furtherance of the agreement is required, and the jury found that Defendant had engaged in "check issuance" in support of the conspiracy. The telephone calls and joint signatures on the check are sufficient evidence of an agreement between Defendant and Arriola and, as noted above, of specific intent to defraud.

---

[7]To confer jurisdiction under the wire fraud statute, the wire transfer need not have been "an essential part of the . . . scheme" to defraud; it "need only be made for the purpose of executing the scheme." *United States v. Garner*, 663 F.2d 834, 838 (9th Cir. 1981). Unlike the Bank of Guam account, the Bank of Hawaii account was a checking account from which Defendant and Arriola could freely withdraw money, and withdrawals from the account began approximately two weeks after the account was established. A rational trier of fact could have found that the wire transfer establishing this account was made for the purpose of advancing the fraudulent scheme.

### 4. Admission of evidence

Defendant argues that the district court erred in admitting three pieces of evidence at trial: an audio/video recording of a telephone interview with Defendant that was broadcast by a local television station; an audio tape of a proceeding in the Superior Court; and a chart showing the division of Vicenta's estate. We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008).

[11] Defendant's counsel objected at trial to the admission of the television broadcast on the grounds that it was hearsay, *see* Fed. R. Evid. 801, 802, and that it did not qualify under the business records exception to the hearsay rule, *see* Fed. R. Evid. 803(6), because the recording was not made in accordance with the television station's policy requiring that a subject give his consent for an interview to be recorded. The district court did not abuse its discretion in overruling the objection. The recording was admitted because it contained Defendant's statement to the effect that the money in the estate was gone. That statement is not hearsay because it is offered against Defendant and is his own statement. *See* Fed. R. Evid. 801(d)(2). Because the statement is not hearsay, the question of whether or not it qualifies under the "business records" exception to the hearsay rule is irrelevant.

[12] The audiotape of the Superior Court proceeding was presented as impeachment material, to show that Defendant, contrary to his own assertion, had been present at a hearing at which the Superior Court judge instructed him that he could not use the funds in Rita's estate to pay Arriola's legal fees. Defendant argues that the tape should not have been admitted because the government had previously told his counsel that it would not be used, and because the government should have presented the tape in its case in chief. But counsel for the government stated that the tape had been provided to Defendant's counsel prior to the trial with the promise that it would

not be used in the government's case in chief, but with no assurance that it would not be used as impeachment evidence. Defendant does not dispute this account.

The government also presented a diagram entitled "Distribution of the Estates," which shows the heirs of Vicenta and of Rita, the amounts to which each heir was entitled pursuant to the Superior Court order, and the amounts actually received by each heir. Defendant asserts that the diagram is a "genealogy" and lacks foundation both on the issue of the family relations depicted therein and on the issue of the distribution of funds listed therein.

[13] Defendant's assertion that the diagram is intended as a genealogy is unsustainable. In fact, the diagram depicts relations of *heirship*, not kinship, as determined by the Superior Court. The Superior Court's rulings on the question of Vicenta's and Rita's heirs are sufficient foundation for the diagram. As for the distribution of funds listed therein, the government called an investigator for the Public Auditor's Office in Saipan to testify, based on examination of the documentary evidence, as to the amounts of money that were owed to and actually received by the various heirs. The investigator's testimony sets forth precisely the figures for the division of Rita's estate that are set forth on the diagram. *See* Fed. R. Evid. 901(b)(1) (evidence may be authenticated by the testimony of a witness with knowledge of the matter in question); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (noting that a document can be authenticated by numerous "alternative means" (citations and footnote omitted)); *United States v. Workinger*, 90 F.3d 1409, 1415-16 (9th Cir. 1996). The numbers given for the division of Vicenta's estate are supported by documents filed with the Superior Court as well as by other supporting documentation in the record.[8]

---

[8]Although not pressed by the government, the diagram was also probably admissible as a summary under Fed. R. Evid. 1006.

## III.   Conclusion

For the reasons set forth above, the judgment of the district court is **AFFIRMED.**