
**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-30193 |
| Plaintiff-Appellee, | D.C. Nos.<br>3:17-cr-00180-RRB-DMS-1<br>3:17-cr-00180-RRB-DMS |
| v. | |
| FOREST MITCHELL KIRST, | OPINION |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted March 17, 2022
San Francisco, California

Before:  William A. Fletcher, Ronald M. Gould, and Daniel P. Collins, Circuit Judges.

Opinion by Judge W. Fletcher;
Partial Concurrence and Partial Dissent by Judge Collins

# SUMMARY[*]

## Criminal Law

The panel affirmed Forest Kirst's conviction on two counts of obstructing a pending proceeding, in violation of 18 U.S.C. § 1505, and affirmed the district court's assessment of a $5,000 fine, in a case in which the National Transportation Safety Board (NTSB) investigated the crash of a small plane that Kirst piloted and in which the Federal Aviation Administration (FAA) revoked Kirst's airman certificate.

The plane crashed as Kirst attempted to fly over Atigun Pass in the Brooks Range in Alaska. During both the investigation and Kirst's appeal of the revocation of his airman certificate, Kirst claimed that the plane was climbing through 5,500 to 5,700 feet with a target altitude of 6,000 feet as it approached the pass. GPS data showed that the plane was flying at an altitude more than 1,000 feet lower than what Kirst claimed. The proceeding in Count One was the NTSB investigation. The proceeding in Count Two was the appeal before the NTSB of the FAA's revocation of his airman certificate.

Challenging his conviction on Count One, Kirst argued that the NTSB's accident investigation was not a pending "proceeding" within the meaning of § 1505, because the statute covers only proceedings where an agency has regulatory or adjudicative authority—authority that the NTSB lacks during an accident investigation. The panel wrote that even if it were not reviewing for plain error, it would affirm, holding that the NTSB's investigation of Kirst's plane crash was a "proceeding" within the meaning of § 1505. The panel explained that in the course of conducting its investigation, the NTSB had both subpoena power and the power to compel testimony under oath, and that under *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994), whose reasoning the panel found persuasive, that is enough.

Rejecting Kirst's challenge to the sufficiency of the evidence on both counts, the panel held that, viewing the evidence in the light most favorable to the government, a reasonable factfinder could have found corrupt intent.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The district court instructed the jury that an act is material under § 1505 "if it has a natural tendency to influence, or is capable of influencing, the agency's decisions or activities." Kirst argued that the phrase "or activities" in the instruction was improper because it allowed the jury to convict based on Kirst's statements that did not affect the NTSB's decisions or decision making process. The panel held that the district court did not err in instructing the jury on the materiality element. The panel noted that this court previously rejected the argument that the word "activities" enabled a jury to find a statement material even if it was incapable of influencing an agency's decisions. The panel also noted that the district court made clear that Kirst's statements must have been capable of influencing the NTSB investigation or appeal, not just *any* activity of the agency.

The panel held that the district court did not commit clear error in finding Kirst able to pay the $5,000 fine, as there was no evidence before the district court showing that Kirst was unable to pay the fine, or was likely to become unable to pay it.

Judge Collins concurred in the judgment in part and dissented in part. Reviewing for plain error, he would reverse Kirst's conviction on Count One and remand for enter of a judgment of acquittal on that count. He wrote that because the NTSB lacks any regulatory or enforcement authority over the accidents it investigates, there is no sense in which the NTSB's investigation into Kirst's accident involved the "administration of the law" under which that proceeding was being conducted within the meaning of § 1505. He wrote that because the proceeding at issue in Count Two involved Kirst's appeal of the FAA's revocation of his airman certificate, that proceeding *did* involve the "administration of the law" under which that proceeding was being conducted, and it therefore fell within the purview of § 1505. He agreed with the majority's opinion to the extent it rejected Kirst's further challenges to his conviction and sentence on Count Two.

---

## COUNSEL

---

Stephen L. Corso (argued) and Charisse Arce, Assistant United States Attorneys; E. Bryan Wilson, Acting United States Attorney; Office of the United States Attorney, Anchorage, Alaska; for Plaintiff-Appellee.

Gene D. Vorobyov (argued), San Francisco, California, for Defendant-Appellant.

W. Fletcher, Circuit Judge:

On August 24, 2014, defendant Forest M. Kirst piloted a small plane in Alaska on a charter flight carrying three paying passengers. The plane crashed as Kirst attempted to fly over Atigun Pass in the Brooks Range. One of the passengers died a month later from injuries sustained in the crash.

The National Transportation Safety Board ("NTSB") investigated the crash, and the Federal Aviation Administration ("FAA") revoked Kirst's airman certificate. During both the investigation and Kirst's appeal of the revocation of his airman certificate, Kirst claimed that the plane was climbing through 5,500 to 5,700 feet with a target altitude of 6,000 feet as it approached the pass. GPS data showed that the plane was flying at an altitude more than 1,000 feet lower than what Kirst claimed.

The government filed three criminal charges against Kirst. Counts One and Two charged Kirst with obstructing a pending "proceeding," in violation of 18 U.S.C. § 1505. The proceeding in Count One was the NTSB investigation. The proceeding in Count Two was the appeal before the NTSB of the FAA's revocation of his airman certificate. Count Three charged Kirst with piloting an aircraft without a valid airman certificate, in violation of 49 U.S.C. § 46306(b)(7). A jury returned guilty verdicts on Counts One and Two and an acquittal on Count

Three.  The district court sentenced Kirst to 12 months and 1 day in prison on Counts One and Two, to run concurrently; 3 years of supervised release; and a $5,000 fine.

On appeal, Kirst challenges his conviction on Count One, arguing that the NTSB investigation was not a "proceeding" within the meaning of § 1505. Further, Kirst challenges his convictions on both Counts One and Two, arguing that there was insufficient evidence to support the convictions and that a jury instruction was improper.  Finally, Kirst challenges the $5,000 fine, arguing that he is unable to pay it.

We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I.  Background

### A.  The Plane Crash

On August 24, 2014, Kirst piloted a small plane on a charter flight out of Fairbanks, Alaska, carrying Darrel Spencer, Daphne McCann (Spencer's sister-in-law), and Marcene Nason (McCann's sister).  Spencer had an interest in photography and booked the flight with Kirst for $3,500 to photograph polar bears.

The weather on the day of the flight was clear, with a light wind.  The plane took off from Fairbanks, stopped at Bettles for a roughly 20-minute break, and continued north toward Prudhoe Bay.  The plan was to fly along the coast to look

3

for polar bears. Spencer sat in the front passenger seat. McCann sat behind Kirst, and Nason sat behind Spencer.

As the plane headed north toward Prudhoe Bay, the passengers spotted a moose and wanted to photograph it. Kirst flew lower and circled the moose for a few minutes before climbing to a higher altitude.

About 15 or 20 minutes later, the plane approached Atigun Pass. The elevation of the pass is 4,400 feet. The elevation of the surrounding peaks is a little over 6,000 feet. McCann testified at trial that the plane was flying below the peaks of the mountains as it approached the pass and that she could see the peaks only by looking up. McCann estimated that the plane was between two-thirds to three-quarters of the way from the ground to the top of the mountains. McCann noticed no vibrations, damage to the propeller, or anything else unusual.

Two witnesses saw the plane as it flew over Chandalar Shelf on the way to Atigun Pass. One of the witnesses testified at trial that there is a "steep incline" after the shelf before reaching the pass. That witness estimated that the plane was flying roughly 500 feet above the shelf. The other witness was driving a gravel truck on the road leading up to the shelf. That witness estimated that the plane was flying roughly 100 feet above the shelf when he first saw it. When the witness

4

reached the shelf, he saw the plane again. He estimated that the plane was now about two miles away and about 1,000 feet above the ground.

Several pipeline workers saw the crash. One worker testified at trial that the plane was "flying real low," that it did not "seem out of control," and that the wings were "level." He testified: "I just saw it coming to a land, and . . . it went to its right side, and it just kind of like stopped and slid like a little bit down the hill." That worker testified that the plane appeared to be flying normally and that it was staying on a flight path parallel to the ground. A second worker testified that when he saw the plane it was "between 250 [and] 500 feet" off the ground. He had previously estimated, in talking to an investigator, that the plane had been "500 to 800 feet" above him. He testified that the engine was "revving," with the "rpm picking up." A third worker described the crash:

> [I]t just kind of shocked me how low it was flying. . . . Four or five seconds later, it was on the ground. . . . [I]t was a miracle landing. . . . [I]t was countoured to the mountain. . . . [W]hen [it] hit, it just stopped and then it just slid downhill a little bit.

Passenger McCann testified:

> We banked to the right while we were looking at the mountains, and I felt like an air pocket, like when you're in a big plane and you go whoop, and your stomach goes up, and the next time I opened my eyes, we were on the ground.

Several pipeline workers rushed to the plane after the crash. When they arrived, Kirst asked them to remove the canopy (the cockpit cover) to get him and the passengers out of the plane. Kirst suffered serious injuries to his back. Despite his injuries, Kirst was lucid and communicative. He gave clear instructions about turning off the fuel system and appeared to be aware of what was happening. Kirst instructed an Alaska Department of Transportation worker to turn off the master switch and the ignition. That worker noticed that one of the propeller blades was missing and that the throttle was bent. He testified at trial, "If it was at full throttle, the throttle would be completely to . . . the panel, and I remember it being out a little bit and bent down."

Kirst made several statements immediately after the crash. One of the workers testified at trial that as Kirst sat on the rocks after being removed from the plane, he said, "Well, there goes insurance, there goes my business." The worker testified that Kirst repeated to himself, "What the heck happened," "Did I come in too low," and appeared to run through the possibilities of what happened before the crash. After another worker helped carry Kirst down to an ambulance, that witness testified that Kirst said that his business was ruined, that he was in a lot of trouble for the crash, and that a downdraft had partially caused the crash. Kirst told one of the Department of Transportation workers that he had been 1,000 feet above the

6

mountaintops, that a downdraft caught the plane, and that increasing the power did not help the plane escape the downdraft. In the ambulance, Kirst told one of the female passengers, "If I were your husband, I would punch me in the nose." When asked why, Kirst responded that it was because they got into the crash. Kirst explained to a medic that he "ran out of horsepower."

Spencer died a month later from injuries suffered in the crash.

### B. The NTSB Investigation

State troopers reported the crash to the NTSB and the FAA. The NTSB is an independent federal agency responsible, inter alia, for investigating transportation accidents and deciding pilots' airman certification appeals. *See* 49 U.S.C. §§ 1131, 1133. In its investigatory role, the NTSB is charged with "establish[ing] the facts, circumstances, and cause or probable cause" of aircraft accidents. *Id.* § 1131. The NTSB has no regulatory or enforcement authority. The FAA has enforcement authority to revoke a pilot's airman certificate. The NTSB and the FAA exchange factual information in the course of their investigations of aviation accidents. 49 C.F.R. §§ 831.5(a)(5), 831.21 (2020).

On the day after the crash, the NTSB launched a limited accident investigation. A limited investigation involves gathering information from first

responders and witnesses without sending an investigator to the crash site. No NTSB investigator visited the crash site.

The NTSB concluded that weather was not an issue in the crash. Data from a weather station 2,500 feet from the accident site indicated no gusty, downdraft-type winds. A photograph taken from a Department of Transportation building before the accident showed no cloud pattern typically associated with downdrafts. Weather data indicated that there were only light winds from the northeast.

Kirst's plane was equipped with two GPS devices. One of the devices, a Garmin 430, was permanently installed on the plane. The Garmin 430 had lost all its data and was of no value to the investigation. State troopers recovered another GPS device, a Garmin 196, from the plane and sent it to the NTSB for examination.

The Garmin 196 recorded rudimentary flight information, including the plane's flight path, ground speed, and over-the-ground altitude. The Garmin 196 also provided a moving map with orientation, and it recorded the plane's position once every ten seconds. Garmin 196 devices have not been certified by the FAA for use in navigation. A government witness testified at trial that he would not use it to make a landing or to avoid terrain. The witness testified that a Garmin 196 is accurate within 49 feet at a 95 percent confidence level.

8

Bradford Sipperley, an aviation safety inspector employed by the FAA, testified at trial that data from the Garmin 196 indicated that the plane made no turns immediately before the crash. Sipperley testified that the data showed a rapid loss of air speed immediately before the crash, indicating a rapid climb in altitude. He testified that the Garmin 196 GPS record indicated that the plane "entered" Atigun Pass at "data point 798." The GPS record shows that at that data point the plane was at an elevation of 3,633 feet, 674 feet above the ground. The record indicates that the plane hit the ground roughly two minutes later, at an elevation of 4,510 feet.

Two FAA safety inspectors visited the site the day after the crash. One of them, Jason Major, testified that one propeller blade was missing. Based on physical evidence at the scene, he concluded that the blade had been torn off when the plane hit the ground. The director of maintenance for Kirst's plane inspected the propeller assembly after the crash. He, too, concluded that the blade had come out "on impact." An air safety inspector of the propeller's manufacturer concluded that the blade broke off when it hit the rocks. The propeller assembly was later shipped to the manufacturing plant in Ohio for further examination. That examination confirmed the air safety inspector's conclusion that ground impact had caused the damage to the propeller. Testing results from an independent

metallurgical lab showed no signs of metal fatigue in the propeller assembly. The missing blade was never found. The manufacturer's air safety inspector thought that the missing blade should be located close to the plane if it had come off upon impact, but testified at trial that failure to locate the propeller blade was not unusual due to ricocheting and terrain.

On September 9, 2014, Clint Johnson, Chief of NTSB's Alaska Regional Office, interviewed Kirst in his hospital room after clearing the interview with his doctors and nurses. Pilots are not required to participate in NTSB interviews, but most participate. Kirst agreed to the interview but did not allow an FAA representative to be present. Kirst's attorney was present at the interview. He had advised Kirst not to agree to the interview due to his injuries. Johnson testified at trial that Kirst was coherent and articulate during the interview.

According to notes taken by an NTSB employee in the hospital room during the interview, Kirst stated that the flight from Bettles to Atigun Pass took about 20 minutes. Kirst stated that just before the accident "[h]e was climbing through 5500 [to] 5700 feet with a target altitude of 6000 feet around Chandalar Shelf," immediately south of Atigun Pass. Kirst stated that Spencer "slumped into the yoke and blocked the throttle and landing gear controls as they encountered rising terrain and a downdraft." Kirst stated that he yelled at the unresponsive Spencer

10

and tried to push him away from the controls. According to Kirst, he was pinned by Spencer and unable to push Spencer off the controls. Kirst told Johnson that Spencer's weight on the controls put the plane in a descent that resulted in the crash. Kirst characterized McCann and Nason, who were sitting in the back, as unresponsive during the time Spencer was blocking the controls.

Johnson testified at trial that he was surprised to hear Kirst say that Spencer had blocked the controls, and that he saw Kirst's lawyer raise his eyebrows when Kirst made that statement. Prior to the interview, NTSB officials had believed that the accident was due to pilot error; that the plane was climbing in a rising terrain; and that the plane could not clear the pass. An NTSB investigator testified at trial that he found Kirst's statement that Spencer had blocked the controls confusing because it was inconsistent with Kirst's previous statement that a downdraft had caused the crash.

On November 7, 2014, Kirst submitted a Form 6120 to the NTSB. The form is an accident report that a pilot must complete after an accident. Kirst indicated in the report that he had been operating a 135 flight (a flight carrying passengers for payment). During a 135 flight, a plane is required to maintain a distance of 500 feet from the terrain, both in altitude and in horizontal distance on each side of the plane. Kirst wrote on the form: "While operating at approximately 5600',

encountered abrupt and unexpected aircraft instability. Took steps to correct but actions were ineffective." Kirst wrote that a "propeller clamp bolt failure caus[ed] blade to become unindexed and blade separation in flight." Kirst wrote in the section asking for a "Safety Recommendation": "Check torque on propeller clamp bolts before further flights on this model propell[e]r, one time fix."

The NTSB upgraded the limited investigation to a more serious field accident investigation as a result of the alleged mechanical failure. A field accident investigation requires more resources and involves representatives from the propeller, airframe, and engine manufacturers. The NTSB informed the FAA of the upgraded investigation in late November 2014.

On December 9, 2016, Kirst emailed the NTSB, alleging that his attorney's office had mistakenly marked the flight as a 135 flight when it was, instead, a 91 aerial photography flight. Kirst's lawyer testified at trial that by characterizing the flight as a 91 flight, Kirst wanted to defend flying low when the passengers took pictures of the moose. Kirst's lawyer testified that he disagreed and thought that Kirst operated a 135 flight.

### C. The FAA's Revocation of Kirst's Airman Certificate

The FAA started an investigation in October 2014. The FAA revoked Kirst's airman certificate on an emergency basis on December 11, 2015,

prohibiting him from flying. Kirst was observed taxiing in his plane (presumably after a flight) after the revocation, prompting the FAA to issue a second emergency order of revocation.

Kirst appealed the FAA's revocation of his airman certificate. The NTSB reviews appeals of the FAA's revocations of airman certificates. 49 U.S.C. § 1133.

During the appeal, the FAA deposed Kirst in March 2016. During the deposition, Kirst stated that the plane flew at 5500–5600 feet and continued climbing before the crash. Kirst stated that as his plane approached Atigun Pass, he could see through the pass, and that the plane "pitched over" badly, falling at 1000 feet per minute. Kirst stated that Spencer flopped forward, and that he (Kirst) turned the plane 180 degrees. According to Kirst, Spencer bumped the throttle, and "everything went to hell again," while he yelled at the other passengers to hold onto Spencer.

Kirst testified before an NTSB administrative law judge ("ALJ") during his appeal. Kirst testified that he was flying at 5500 feet and aiming to climb to 6000 feet before the crash. According to Kirst, the plane pitched over badly, Spencer "had gone forward under the controls," and he yelled for someone to get Spencer off the controls. Kirst also testified that a proper investigation would have revealed that the propeller failed and completely disconnected from the plane.

13

Kirst claimed that he made a U-turn when the airplane pitched over, but later testified that he made a 360-degree turn. Kirst also testified that he lost 1500 feet of elevation before the crash. The NTSB ALJ upheld the FAA's revocation of Kirst's airman certificate.

The FAA's enforcement attorney testified at trial that Kirst's altitude statements during his appeal were "very important." He testified that if the statements had been accurate, the plane would have been more than 500 feet above the pass, resulting in no violation.

### D. Indictment, Trial, and Conviction

In December 2017, the government filed a three-count indictment against Kirst.

Counts One and Two charged Kirst with obstructing the "due and proper administration of the law" in a "pending proceeding" before an agency, in violation of 18 U.S.C. § 1505. Section § 1505 provides in relevant part:

> Whoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, *obstruct*, or impede the *due and proper administration of the law under which any pending proceeding is being had* before any . . . agency of the United States . . . [s]hall be fined under this title, imprisoned not more than 5 years . . . , or both.

18 U.S.C. § 1505 (emphasis added).

14

Count One charged Kirst with obstructing the NTSB investigation between about August 24, 2014, and March 9, 2017.  Count One alleged that Kirst made the following false and misleading statements during the investigation, including:  (1) that Kirst's plane was climbing through 5,500 to 5,700 feet with a target altitude of 6,000 feet just prior to the crash; (2) that Spencer slumped into the yoke and blocked the throttle and landing gear controls just prior to the crash; and (3) that a propeller blade failed in flight.  Count Two charged Kirst with obstructing the appeal before the NTSB of the revocation of his airman certificate by the FAA between about April 1, 2015, and September 2, 2016.  Count Two alleged that Kirst made false and misleading statements during the appeal, including:  (1) that Kirst's plane was climbing through 5,500 to 5,700 feet with a target altitude of 6,000 feet just prior to the crash; (2) that the plane dropped approximately 1,500 feet just prior to the crash; and (3) that a propeller blade failed in flight.  Count Three charged Kirst with piloting an aircraft without a valid airman certificate in violation of 49 U.S.C. § 46306(b)(7).

At trial, the government presented the evidence summarized above.  The defense presented testimony from, inter alia, Kirst, his attorney, his wife, and a clinical psychologist.

Kirst testified that he learned to fly in the 1970s, and that he returned to aviation in 2002 after 15 years of teaching. He opened a flight instruction business in 2006, and later added sightseeing tours and aerial mapping to the business. Kirst testified that he is an experienced pilot and that he has done about 1000 hours of aerial mapping.

Kirst testified that he was very familiar with the route taken during the August 24 flight and that he "can almost fly it in [his] sleep." He testified that he is familiar with the elevations of the mountains around the crash site. He testified that he relied on the plane's built-in altimeter during the flight. He testified that because of his familiarity with the terrain, he could estimate the altitude by the distance between the plane and the mountain tops.

Kirst testified that he encountered no problem flying the plane between leaving Bettles and entering the mountainous area near Atigun Pass, despite some winds at about 5000 feet. He planned to go up the valley, turn right toward the Atigun Pass, and go over the pass. He testified that the plane was at an altitude of about 4500 feet and was climbing up to 5000 feet as he turned into the valley leading to the pass. On cross examination, Kirst testified that the plane was climbing through 5500–5700 feet with a target altitude of 6000 feet as it approached Atigun Pass after Chandalar Shelf. Kirst testified that Spencer

16

slumped forward, blocking the controls. The plane pitched nose down and became uncontrollable. Kirst pulled the power to idle and yelled for passengers to get Spencer off the controls, but there was no response. Kirst made a 180-degree turn to the left. The plane was losing altitude at over 1000 feet per minute. Kirst aimed to land the plane on a steep hill, but the plane had no power.

Kirst acknowledged that the GPS data relied upon by the government, which the government stated that it had obtained from his plane's Garmin 196, never showed the plane flying at more than 1000 feet above the ground. But Kirst was unwilling to acknowledge that the government's data came directly from his Garmin 196. According to Kirst, "It's [the government's witness's] collection of some data from me, some data from Google Earth, or wherever." Kirst testified that he had not used GPS-derived altitude but had relied on the plane's altimeter. According to Kirst, his altimeter had shown that the plane was flying between 4700 and 5200 feet as it started through Atigun Pass. Kirst testified that he did not remember any of his conversations with the pipeline workers who arrived at the crash site or with the first responders. Kirst also testified that he did not remember his September 9 interview with Johnson in the hospital.

Kirst testified that while he was in the hospital, he was taking morphine, Fentanyl, Methadone, Lyrica, OxyContin, Tylenol, and a blood thinner. He

17

continued to take some of these medications after being released from the hospital. Kirst testified that he signed the NTSB's Form 6120 in November 2014 while under the influence of his medications, and that he could not read any of the checkmarks or boxes on the form. He testified that during the NTSB appeal in 2016, he received copies of the form, eyewitness reports, and mechanical reports. Kirst testified that he later reached out to the NTSB to correct mistakes and that the form had been filled out by people in his attorney's office.

Kirst testified that the propeller blade came apart and that "it started in the air" at around 5,600 feet. Kirst testified that he thought that the propeller was improperly assembled, and that he had sued the manufacturers of the propeller. Kirst lost the lawsuit at summary judgment and later lost the appeal.

Kirst testified that he resumed flying in July 2015 after receiving medical clearance. He testified that he flew after the FAA issued the first emergency order revoking his airman certificate because his attorney advised him that he could.

Kirst's attorney testified that he likely drafted most of the NTSB Form 6120, and that "[Kirst] would come into my office, read it, review it, give it his okay, and sign it." However, the attorney testified that he had no actual recollection of Kirst's coming into the office and signing the form. The attorney testified, further,

18

that he would not have let Kirst sign the document if he had concerns about his mental state.

Kirst's wife testified that when she arrived at the hospital on August 30, shortly after the crash, Kirst was "heavily drugged" and not conversational. She testified that a few weeks into his hospital stay, Kirst was occasionally friendly and cheerful, but was sometimes confused about things. Another witness testified that when he first saw Kirst in the hospital, he was "five percent Forest [Kirst]." When Kirst was released from the hospital, he was "around 85 percent the person" the witness had always known.

Dr. David Sperbeck, a psychologist, testified about Kirst's ability to remember the crash. Dr. Sperbeck had reviewed Kirst's records but had never examined him. He testified that Kirst had been too fragile to undergo a thorough evaluation while in the hospital. In Dr. Sperbeck's opinion, Kirst had retrograde amnesia and did not know what had happened before the crash. According to his testimony, people with retrograde amnesia can recover their memories spontaneously over time under ideal circumstances, but Kirst was in extreme pain and heavily sedated. Post-traumatic amnesia creates gaps in a person's memory without complete memory loss. Particularly impaired patients may engage in unintentional misrepresentation of what happened. Patients could suffer from

confirmation bias, and "attend[] to" facts that reinforce their beliefs—a process different from lying. A person suffering from amnesia can appear normal to others.

Dr. Sperbeck testified that as a result of his retrograde amnesia, Kirst was probably speculating, deducing, or trying to recreate what happened before the crash based on his background and his history. The medications likely interfered with Kirst's memory, and Kirst could not give reliable statements for probably about six months, because recovery from mild traumatic brain injury takes one to eighteen months. Dr. Sperbeck acknowledged that it would be "suspicious" if an amnesia patient recalled only facts that excused his conduct, especially if his baseline is simply that he does not remember anything.

After the government rested, Kirst moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. The district court denied the motion without prejudice. Kirst filed a renewed Rule 29 motion before closing arguments, which the district court also denied.

The jury returned a special verdict finding Kirst guilty of obstructing proceedings before an agency in violation of 18 U.S.C. § 1505 (Counts One and Two). It found, as to Count One, that Kirst violated § 1505 by falsely stating that his "plane was climbing through 5,500 to 5,700 feet with a target altitude of 6,000

feet just prior to the crash." It found, as to Count Two, that Kirst violated § 1505 by making the false statement just described, and the additional false statement that "just prior to the crash, [his] plane dropped in altitude approximately 1,500 feet." The jury acquitted Kirst of violating 49 U.S.C. § 46306(b)(7) (Count Three). The district court sentenced Kirst to 12 months and 1 day in prison on Counts One and Two, to be served concurrently; 3 years of supervised release; and a $5,000 fine.

## II. Analysis

### A. Count One: "Proceeding" Under § 1505

Kirst appeals his conviction under Count One, arguing that the NTSB's accident investigation was not a pending "proceeding" within the meaning of § 1505. Kirst contends that proceedings under § 1505 include only proceedings where an agency has regulatory or adjudicative authority. He points out that the NTSB lacks such authority during an accident investigation.

At trial, Kirst moved for acquittal under Rule 29. He contended that the government had not presented sufficient evidence that he had knowingly lied to obstruct an investigation. However, he did not mention in his motion his current argument based on § 1505. We therefore review for plain error his argument under § 1505. *See United States v. Lopez*, 4 F.4th 706, 719 (9th Cir. 2021) ("While Rule 29 motions need not specify grounds for acquittal, it is well established that Rule

21

motions raising particular grounds fail to preserve appellate review of other grounds not raised. We review forfeited challenges to the sufficiency of the evidence for plain error." (citations omitted)).

"To establish plain error, the defendant must at least demonstrate an error, that the error was plain, and that the error prejudiced his substantial rights. We may overturn a conviction for plain error resulting in insufficient evidence only 'to prevent a miscarriage of justice or to preserve the integrity and the reputation of the judicial process.'" *Id.* (citations omitted) (quoting *United States v. Garcia-Guizar*, 160 F.3d 511, 516 (9th Cir. 1998)). "An error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Wijegoonaratna*, 922 F.3d 983, 991 (9th Cir. 2019) (quoting *United States v. De La Fuente*, 353 F.3d 766, 769 (9th Cir. 2003)).

Even if we were not reviewing for plain error, we would affirm. It is settled law in this circuit that, as a general matter, an administrative investigation is a "proceeding" within the meaning of § 1505. In *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (per curiam), the defendant appealed from a conviction under § 1505 for submitting a false document to the Internal Revenue Service, which was performing an investigation under the Economic Stabilization Act

22

Amendments of 1971. We held, "An administrative investigation is a 'proceeding' within the meaning of 18 U.S.C. [§] 1505." *Id.* at 1278 (citing *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970)).

In *United States v. Technic Services., Inc.*, 314 F.3d 1031, 1037 (9th Cir. 2002), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc), the Environmental Protection Agency investigated Technic Services, Inc. ("TSI") for possible violations of the Clean Air Act and Clean Water Act. Defendant Rushing, an employee of TSI, was convicted under § 1505 of obstructing the investigation. *Id.* Rushing conceded his "interference with workers' air monitoring devices." *Id.* at 1044. We upheld the conviction, writing that "evidence of the EPA proceeding was sufficient to support Rushing's conviction for obstructing a federal proceeding by tampering with employees' air monitors." *Id.*

In *United States v. Pacific Gas & Electric Co.*, 153 F. Supp. 3d 1076, 1078 (N.D. Cal. 2015), defendant Pacific Gas & Electric ("PG&E") moved to dismiss Count One of an indictment under § 1505 charging obstruction of an NTSB investigation, similar to the NTSB investigation at issue in the case now before us. PG&E contended that an NTSB investigation is not a "proceeding" within the meaning of § 1505, arguing that § 1505 applies only to agencies with adjudicatory

23

or rulemaking authority. *Id.* at 1078–79. In a careful opinion, the district court denied the motion. *Id.* at 1084. The court held that an NTSB investigation is a proceeding under § 1505, relying heavily on *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994). The court wrote:

> [U]nder the reasoning in *Kelley*, the NTSB is unquestionably an agency "with the power to enhance [its] investigations through the issuance of subpoenas or warrants." *Kelley*, 36 F.3d at 1127. Indeed, Congress gave the NTSB broad powers: "The [NTSB] . . . may conduct hearings to carry out this chapter, administer oaths, and require, by subpena [sic] or otherwise, necessary witnesses and evidence." 49 U.S.C. § 1113(a).

*PG&E*, 153 F.3d at 1082 (second, third, and fourth alterations in original).

Like the district court in *PG&E*, we find the reasoning of *Kelley* persuasive. In *Kelley*, Counts Five and Six of the indictment charged the defendant with obstructing an investigation by the U.S. Agency for International Development ("AID"), in violation of § 1505. *Kelley*, 36 F.3d at 1123. The D.C. Circuit held that a "formal investigation opened by the Office of the Inspector General of AID" was not a "mere police investigation." *Id.* at 1127 (quoting *United States v. Batten,* 226 F. Supp. 492, 494 (D.D.C. 1964)). Rather, it was "a 'proceeding' within the meaning of § 1505," because the agency had the power to issue subpoenas and compel testimony under oath. *Id.* The court wrote:

> The Inspector General's office of AID is charged with the duty of supervising investigations relating to the proper operation of the agency.

24

In addition, the Inspector General is empowered to issue subpoenas and to compel sworn testimony in conjunction with an investigation of agency activities. Accordingly, the Inspector General's inquiries, albeit preliminary, constitute a "proceeding" within the meaning of § 1505.

*Id.* (citation omitted).

So, too, here. In conducting an investigation of an airplane crash, the NTSB has authority to issue subpoenas and to compel testimony under oath. An NTSB regulation provides:

(a) General authority of investigators. To carry out the statutory responsibilities of the agency, an NTSB investigator may—

. . .

(2) Administer oaths;
(3) Require, by subpoena or otherwise, the production of evidence and witnesses[.]

. . .

(b) Subpoenas. The NTSB may issue a subpoena, enforceable in Federal District Court, to obtain testimony or evidence related to an accident, including but not limited to personal electronic devices.

49 C.F.R. § 831.9 (2017); *see* 49 U.S.C. § 1113(a)(1).

We therefore conclude that the NTSB investigation of Kirst's plane crash was a "proceeding" within the meaning of § 1505. In the course of conducting its investigation, the NTSB had both subpoena power and the power to compel testimony under oath. Under *Kelley*, and under our holding today, that is enough. Kirst was thus properly charged in Count One with obstructing an NTSB proceeding.

Our dissenting colleague disagrees. He contends that although the NTSB investigation is a kind of "proceeding," it is not a proceeding that involves the "administration of the law" within the meaning of § 1505. Dissent at 12–21. For the convenience of the reader, we again quote the relevant portion of § 1505:

> Whoever corruptly . . . influences, *obstructs*, or impedes or endeavors to influence, obstruct, or impede the *due and proper administration of the law under which any pending proceeding is being had* before any . . . agency of the United States . . . [s]hall be fined under this title, imprisoned not more than 5 years . . . , or both.

18 U.S.C. § 1505 (emphasis added).

Our colleague construes the phrase "administration of the law" narrowly. In his view, "administration of the law" requires that an agency conducting a proceeding not only have authority to conduct the proceeding, but also have authority to enforce any judgment or decision resulting from the proceeding. Dissent at 16. He writes, "[W]here the 'proceeding' at issue is an investigation, § 1505 requires proof that the defendant obstructed the agency's *enforcement* of the law at issue in the investigation." Dissent at 16 (emphasis in original). Our colleague argues that because it is the FAA rather than the NTSB that has the authority to enforce the law by revoking Kirst's airman certificate, the NTSB's investigation does not involve the "administration of the law" within the meaning of § 1505.

26

To support his argument, our colleague relies on two Supreme Court cases. Our colleague relies most heavily on *United States v. Aguilar*, 515 U.S. 593 (1995), in which a federal district court judge was convicted under 18 U.S.C. § 1503 for "uttering false statements to an investigating agent." *Id.* at 600. The Court reversed the conviction, holding that the false statements of the defendant were not covered by § 1503. *Id.* Section 1503 does not prohibit obstruction of the "due and proper administration of law," as does § 1505. *See* 18 U.S.C. §§ 1503, 1505. Rather, in relevant part, § 1503 prohibits "obstruct[ing] . . . the due administration *of justice*." *Id.* § 1503 (emphasis added).

The Supreme Court in *Aguilar* noted that § 1503 was based on a statute that the Court had interpreted one hundred years earlier, in *Pettibone v. United States*, 148 U.S. 197 (1893). *Aguilar*, 515 U.S. at 599. In *Pettibone*, the Court had interpreted the predecessor statute to apply only to obstruction of pending court proceedings. *See id.* Later court of appeals decisions had read § 1503 similarly narrowly, as applying only to pending judicial or grand jury proceedings. *Id.* Relying on *Pettibone* and agreeing with the later court of appeals decisions, the Court construed "administration of justice" in § 1503 to require that a defendant obstruct, or intend to obstruct, a "judicial proceeding[]." *Id.* Given the history and wording of § 1503, the question at issue in that case, and the narrow conclusion

27

reached by the Court, we fail to see how *Aguilar* supports our colleague's interpretation of § 1505. That is, we fail to see how *Aguilar* supports the conclusion that § 1505 applies only to a proceeding where the agency conducting an investigation has enforcement authority against a party to the investigation.

Our colleague also relies on *Marinello v. United States*, 138 S. Ct. 1101 (2018). The defendant in *Marinello* was criminally charged under 26 U.S.C. § 7212(a) with eight tax-related acts, including "failing to maintain corporate books and records," "hiding income," and "paying employees . . . with cash." *Id.* at 1105 (omission in original). Section 7212(a) is part of the Tax Code. It prohibits "obstruct[ing] . . . the due administration of this title." 26 U.S.C. § 7212(a). The jury was instructed that it could convict the defendant based on any of the listed acts. *Marinello*, 138 S. Ct. at 1105. The Supreme Court reversed his conviction on the ground that some of the charged acts did not come within the prohibition of the statute. *Id.* at 1110.

The Court recognized that the statutory phrase "due administration" was susceptible to an extremely broad interpretation, potentially including "every '[a]ct or process of administering." *Id.* at 1106 (alteration in original) (quoting Webster's New International Dictionary 34 (2d ed. 1954)). But the Court held that, in context, the phrase had a narrower meaning. *Id.* The Court wrote:

> [T]he whole phrase—the due administration of the Tax Code—is best viewed, like the due administration of justice [in *Aguilar*], as referring to only some of those acts or to some separable parts of an institution or business. . . . Here statutory context confirms that the text refers to specific, targeted acts of administration.

*Id.* The Court interpreted the phrase as referring to "specific interference with targeted governmental tax-related proceedings, such as a *particular investigation* or audit." *Id.* at 1104 (emphasis added).

The Court held in *Marinello* that the government was required under § 7212(a) to "show that the proceeding was pending at the time the defendant engaged in the obstructive conduct or, at the least, was then reasonably foreseeable by the defendant." *Id.* at 1110. There is nothing in *Marinello* that restricts the phrase "due administration of the Tax Code" to obstruction of enforcement as distinct from obstruction of an investigation that might, or might not, lead to enforcement. It is sufficient under *Marinello* that a defendant be charged with obstructing "a particular investigation." *Id.* at 1104.

Neither *Aguilar* nor *Marinello* supports our colleague's conclusion that in order for obstruction of an investigation to constitute a violation of § 1505, the investigation must be by an agency that has enforcement authority against a party to the investigation.

### B. Counts One and Two: Sufficiency of the Evidence

29

Kirst argues that the government presented insufficient evidence that he had corrupt intent under § 1505 to support a conviction under either Count One or Count Two. "We review the sufficiency of the evidence de novo." *United States v. Kaplan*, 836 F.3d 1199, 1211 (9th Cir. 2016) (citing *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (per curiam)). "There is sufficient evidence to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 1211–12 (quoting *Sullivan*, 522 F.3d at 974). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of [a] requisite element." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc) (alteration in original) (citation and internal quotation marks omitted).

The government presented sufficient evidence to prove corrupt intent. "'[D]irect proof' of one's specific wrongful intent is 'rarely available,'" and wrongful intent "may be inferred from circumstantial evidence." *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) (quoting *United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984)). As to Count One, the jury convicted Kirst of obstructing the NTSB investigation based on his statement that the plane was

30

climbing through 5500–5700 feet prior to the crash. As to Count Two, the jury convicted Kirst of obstructing the NTSB's review of the FAA's revocation of his airman certificate based on his statements that the plane was climbing through 5500–5700 feet just prior to the crash, and that the plane lost about 1500 feet in altitude just prior to the crash. At trial, GPS data showed that Kirst was flying 1000 feet below the altitude he claimed, and various eyewitnesses testified that the plane was flying low. Kirst had a motive to obstruct the NTSB proceedings by providing false statements during the investigation and appeal because his airman certificate and his livelihood were at stake. Viewing the evidence in the light most favorable to the government, a reasonable factfinder could have found corrupt intent.

## C. Materiality

The district court instructed the jury that "[a]n act is 'material' if it has a natural tendency to influence, or is capable of influencing, the agency's decisions *or activities*" (emphasis added). Kirst argues that the phrase "or activities" in the instruction was improper because it allowed the jury to convict based on Kirst's statements that did not affect the NTSB's decisions or decisionmaking process.

"We review the district court's 'precise formulation' of jury instructions for abuse of discretion." *United States v. Smith*, 831 F.3d 1207, 1214 (9th Cir. 2016)

31

(quoting *United States v. Lloyd*, 807 F.3d 1128, 1165 (9th Cir. 2015)).  "We review . . . whether the jury instructions misstated an element of the crime . . . de novo." *Id.*

The district court's instruction accords with Ninth Circuit Model Criminal Jury Instruction 24.10.  We have addressed a similar challenge to a jury instruction on materiality that contains the phrase, "the agency's decisions or activities." *United States v. Peterson*, 538 F.3d 1064, 1072–73 (9th Cir. 2008).  We rejected the argument that the word "activities" enabled the jury to find a statement material even if it was incapable of influencing an agency's decisions.  *Id.*  Further, the district court made clear that Kirst's statements must have been capable of influencing the NTSB investigation or appeal, not just *any* activity of the agency. On Count One, the district court instructed, "The Government must . . . prove beyond a reasonable doubt that the charged conduct . . . was capable of influencing the *investigation* conducted by the NTSB" (emphasis added).  On Count Two, the district court instructed, "The Government must prove . . . beyond a reasonable doubt that the charged conduct . . . was capable of influencing a *pending proceeding* before the NTSB, Office of Administrative Law Judges, which was the appeal of the revocation by the FAA of defendant's airman's certificate" (emphasis added).

32

The district court thus did not err in instructing the jury on the materiality element.

## D. The Fine

Finally, Kirst argues that the district court committed clear error in determining that he could pay the $5,000 fine.

"A district court's finding of whether a defendant is able to pay the fine is reviewed for clear error." *United States v. Orlando*, 553 F.3d 1235, 1240 (9th Cir. 2009). "[A] finding is clearly erroneous if it is illogical, implausible, or without support in the record." *United States v. Burgos-Ortega*, 777 F.3d 1047, 1056 (9th Cir. 2015) (quoting *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010)). There was no evidence before the district court showing that Kirst was unable to pay the fine, or was likely to become unable to pay it in the future. The district court thus did not commit clear error in finding Kirst able to pay the $5,000 fine.

## Conclusion

We hold that it was not error, let alone plain error, to convict Kirst on Count One, on the ground that the NTSB investigation was a "proceeding" within the meaning of 18 U.S.C. § 1505. We hold, further, that sufficient evidence supported Kirst's conviction, and that the district court did not err in instructing the jury on

33

the materiality element. We hold, finally, that the district court did not commit clear error in assessing the $5,000 fine.

**AFFIRMED.**

*United States v. Kirst*, 20-30193

COLLINS, Circuit Judge, concurring in the judgment in part and dissenting in part:

After a jury trial, Forest Kirst was convicted of two counts of "obstruct[ing] . . . the due and proper administration of the law" in connection with agency proceedings arising from the crash of a small airplane Kirst had been piloting. *See* 18 U.S.C. § 1505. The proceeding at issue in Count 1 was the investigation undertaken by the National Transportation Safety Board ("NTSB"). However, because the NTSB lacks any regulatory or enforcement authority over the accidents it investigates, there is no sense in which the NTSB's investigation into Kirst's accident involved the "*administration of the law* under which [that] proceeding [was] being had" within the meaning of § 1505. *Id.* (emphasis added). Reviewing for plain error, I therefore would reverse Kirst's conviction on Count 1 and remand for entry of a judgment of acquittal on that count. But because the proceeding at issue in Count 2 involved Kirst's appeal of the Federal Aviation Administration's revocation of his airman certificate, that proceeding *did* involve the "administration of the law" under which that proceeding was being conducted, and it therefore fell within the purview of § 1505. As to the remaining issues, I agree with the majority's opinion to the extent that it rejects Kirst's further challenges to his conviction and sentence on Count 2. I therefore dissent as to Count 1 and concur in the judgment as to Count 2.

# I

I begin with a brief summary of the relevant facts. On August 24, 2014, Kirst crashed a small plane carrying three tourists on an aerial photography tour. Kirst and the passengers were severely injured, and one passenger died about a month later. The NTSB initiated an investigation to determine "the facts, circumstances, and cause or probable cause" of the accident. *See* 49 U.S.C. §§ 1131(a)(1)(A), 1132(a)(1)(A). As the Chief of the NTSB's Alaska Regional Office explained at trial, the NTSB's inquiry was "strictly investigative" and its "ultimate goal" was to "try and keep the accident from happening again."

On September 9, 2014, the NTSB interviewed Kirst "to find out what the circumstances were that led up to the accident" and "to give [the NTSB] a better idea of which direction to go" with the investigation. No members of the Federal Aviation Administration ("FAA") were present during the interview. Kirst stated, in relevant part, that "[h]e was climbing through 5500–5700 feet with a target altitude of 6000 feet" prior to the crash. Kirst later submitted to the NTSB a written accident report, in which he stated, "While operating at approximately 5600', encountered abrupt and unexpected aircraft instability. Took steps to correct but actions were ineffective. Made decision to protect passengers and myself in light of conditions. Aircraft hit the ground nose up and came to rest on side of hill."

The FAA visited the crash site shortly after the accident, but the NTSB did not. In October 2014, the FAA formally notified Kirst about its investigation. The FAA subsequently concluded that Kirst had violated FAA regulations by "flying too low for the terrain," and it revoked Kirst's airman certificate in 2015. Kirst appealed the revocation order to an NTSB administrative law judge. *See* 49 U.S.C. § 1133. Kirst stated in a deposition associated with the appeal that prior to the crash he was flying between 5,500 and 5,600 feet and was heading toward 6,000 feet. Kirst later testified at a hearing associated with the appeal that he "passed through 5,500. I was aiming for 6,000, probably close to 5,600." The NTSB upheld the FAA's revocation order.

On December 13, 2017, the Government charged Kirst with two counts of violating 18 U.S.C. § 1505 and one count of piloting an aircraft without a valid airman certificate. Count 1 alleged that Kirst obstructed "the due and proper administration of the law under which a pending proceeding was being held before the NTSB, to wit, the investigation of the August 24, 2014, crash . . . by making numerous false and misleading statements," including that his "plane was climbing through 5,500 to 5,700 feet with a target altitude of 6,000 feet just prior to the crash." Count 2 alleged that Kirst obstructed "the appeal of the revocation by the FAA of [Kirst's] airman certificate, by making numerous false and misleading statements," including that his "plane was climbing through 5,500 to 5,700 feet

3

with a target altitude of 6,000 feet just prior to the crash."

On November 25, 2019, a jury found Kirst guilty on the first two counts and not guilty on the third count. Kirst was sentenced to 12 months and 1 day in prison, 3 years of supervised release, and a $5,000 fine.

## II

On appeal, Kirst contends that the evidence on Count 1 at trial was insufficient to establish a violation of § 1505, because the statements he made in connection with the NTSB's factual investigation had nothing to do with the "administration of the law" under which a "pending proceeding" was being conducted. *See* 18 U.S.C. § 1505 (requiring, as an element of the offense, that the defendant obstructed the due "administration of the law under which any pending proceeding is being had").

## A

In addressing this contention, we confront a threshold issue as to whether we may consider this argument and, if so, what is the proper standard of review. I conclude that we can consider this point, but that our review is only for plain error.

The Government contends that *any* review of this issue is barred because Kirst failed to raise a pretrial challenge to the sufficiency of the indictment under Federal Rule of Criminal Procedure 12(b)(3). According to the Government, it was apparent on the face of Kirst's indictment that the Government's position was

that an NTSB investigation involves a "pending proceeding" involving the "administration of the law," and if Kirst objected to that view, he should have filed a Rule 12(b)(3) motion to dismiss the indictment. Because he did not file such a pretrial motion, the Government argues, he cannot raise this issue at trial or thereafter unless he first "shows good cause" for his failure to file such a pretrial motion. *See* FED. R. CRIM. P. 12(c)(3). The Government's position is deeply flawed and reflects a basic misunderstanding of the criminal trial process.

Under the Constitution, a defendant "shall not be held to answer" for a felony "unless on a presentment or indictment of a Grand Jury." *See* U.S. CONST. amend. V; *see also Stirone v. United States*, 361 U.S. 212, 215 (1960). Thereafter, the defendant is constitutionally entitled to a "trial" on that charge "by an impartial jury." *See* U.S. CONST. amend. VI; *see also* U.S. CONST. art. III, § 2, cl. 3. At that trial, the Government must shoulder the burden of proving "each element" of the crime "to the jury beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 104 (2013) (citing, *inter alia*, *In re Winship*, 397 U.S. 358, 364 (1970)). Within that basic framework, the Federal Rules of Criminal Procedure set forth certain additional details about how the criminal process is to be conducted, including challenges to the sufficiency of an indictment, challenges to venue, requests to suppress evidence, requests for particular jury instructions, and requests for a directed verdict. *See* FED. R. CRIM P. 12(b)(3), 29, 30.

The particular rule that the Government invokes here is Rule 12(b)(3), which states that a "*defect in the indictment*" on grounds of "failure to state an offense" "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *See* FED. R. CRIM. P. 12(b)(3)(B)(v) (emphasis added). Rule 12 further provides that "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." *See* FED. R. CRIM. P. 12(c)(3). This rule has no application here, because Kirst is not asserting, or seeking relief for, any defect in the indictment. Rather, he is asserting that, at his criminal trial, the Government failed to present sufficient evidence to establish each element of the § 1505 charge for which he was being tried.

The Government nonetheless contends that, where a defendant's claim of innocence of a charge at trial rests on the premise that the Government misunderstands the applicable law governing the elements of the charged offense, the defendant cannot assert such an argument if the Government's legal misunderstanding was apparent on the face of the indictment and, without good cause, the defendant failed to raise the legal issue by pretrial motion. Nothing in the text of the rules supports this position. Rule 12(b)(3) merely states that, by failing to file a pretrial motion, a defendant forfeits his right to seek relief based on

6

a "defect in the indictment," *i.e.*, the defendant cannot later be heard to assert that the Government has violated his right *to a proper indictment* that, for example, reflects a grand jury's finding of probable cause as to each element. *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *Giordenello v. United States*, 357 U.S. 480, 487 (1958). But the loss of that right to challenge a "defect in the indictment" does not somehow mean that the defendant is deprived of *other* rights conferred by the federal rules or the Constitution, such as the right to a properly instructed jury or the right to have a jury find all of the elements of the offense beyond a reasonable doubt. Regardless of whether the indictment was defective and would have been subject to dismissal, a defendant is still entitled to insist at trial that the *correct* law be applied in defining the elements of the charge being tried, *see* FED. R. CRIM P. 30(a) ("Any party may request in writing that the court instruct the jury on the law as specified in the request."), and that he cannot be convicted unless a jury finds, beyond a reasonable doubt, each of the elements of the offense being tried, *see Alleyne*, 570 U.S. at 104.

Consequently, where the Government's approach to a prosecution rests on a fundamental misunderstanding of the applicable law governing the elements of an offense, the Constitution and the criminal rules unsurprisingly give a defendant multiple opportunities to contest that misunderstanding, as the Government's error successively infects each of the multiple stages of the criminal process. In such a

7

case, Rule 12(b)(3) merely provides that, if a timely pretrial motion is not filed, the defendant cannot challenge a "defect in the indictment" and insist, for example, that if the Government wishes to proceed, a new grand jury must make the necessary findings of probable cause under the correct law. Nothing in the text of Rule 12 supports the quite different proposition that, if a defendant fails to challenge such a legal defect when it is apparent on the face of the indictment, he thereafter cannot contest that underlying legal defect when it reappears in other forms at trial—meaning, for example, that the jury must be mis-instructed as to the law and that the defendant must endure a sham trial at which he cannot assert his actual innocence of the charge under the correct law. *Cf. United States v. Zalapa*, 509 F.3d 1060, 1064 (9th Cir. 2007) (holding that a defendant who failed to raise a Rule 12(b) challenge to a multiplicitous indictment "waived any objection to the form of the indictment" but "did not . . . waive his right to object to his sentences and convictions as multiplicitous on appeal"); *Launius v. United States*, 575 F.2d 770, 772 (9th Cir. 1978) ("The argument that one waives his right to object to the imposition of multiple sentences by his fail(ing) to object to the multiplicious nature of an indictment is a non sequitur," because "Rule 12 applies *only to objections with regard to the error in the indictment itself*; . . . if sentences are imposed on each count of that multiplicious indictment the defendant is not forced to serve the erroneous sentence because of any waiver." (emphasis added and

8

citation omitted)).

An example will further reveal the absurdity of the Government's argument. Suppose that the defendant is indicted for bank robbery in violation of 18 U.S.C. § 2113, but the indictment fails to include an allegation that the bank in question was federally insured or otherwise covered by the statute. *See* 18 U.S.C. § 2113(f). If challenged in a pretrial motion, such a facial defect would require dismissal of the indictment. *See United States v. Qazi*, 975 F.3d 989, 991 (9th Cir. 2020) ("In this circuit an indictment missing an essential element that is properly challenged before trial *must* be dismissed."). But if the defendant does not bother to file such a motion, that would not mean that, at the later trial, he could not then insist under Rule 30 that the jury be instructed that, in order to convict, it must find beyond a reasonable doubt that the bank was federally insured. Nor would it mean that, if the Government fails at trial to introduce evidence that the victim bank was federally insured, the defendant could not move for a judgment of acquittal under Rule 29. Under the Government's view, however, the failure to assert a Rule 12 challenge to the indictment's facially defective omission of an element of the offense would mean that the defendant is thereafter barred from "circumvent[ing] his failure by framing the issue as a sufficiency of the evidence claim." The trial would have to proceed, according to the Government, under the legally defective framing of the offense contained in the indictment, and the defendant could not

9

assert the separate rights granted to him by Rule 29, Rule 30, and the Constitution to challenge at trial the Government's failure to prove every element of the offense beyond a reasonable doubt. Nothing in the rules, precedent, or common sense supports such an astonishing result. Indeed, the Government fails to cite a single precedent that adopts its extraordinary position.[1]

Accordingly, Rule 12(b)(3) poses no categorical bar to challenging the Government's construction of § 1505 at trial, either by requesting appropriate jury instructions under Rule 30 or by seeking a judgment of acquittal under Rule 29. The fact remains, however, that Kirst at trial did not request any such jury instructions. And although he did make a Rule 29 motion at trial, it was based

---

[1] Nor have I found any. In *United States v. Ghanem*, 993 F.3d 1113 (9th Cir. 2021), we held that a failure to raise certain objections to *venue* before trial precluded the defendant from raising those objections in a subsequent Rule 29 motion challenging the sufficiency of the Government's evidence of venue at trial. *Id.* at 1119–21. But venue is "not an essential fact constituting the offense charged," *United States v. Powell*, 498 F.2d 890, 891 (9th Cir. 1974); it need only be proved "by a preponderance of the evidence," *United States v. Chi Tong Kuok*, 671 F.3d 931, 937 (9th Cir. 2012) (citation omitted); and a failure to prove venue results only in dismissal of the indictment and not an "acquittal" that would implicate the double jeopardy clause, *see United States v. Kaytso*, 868 F.2d 1020, 1021–22 (9th Cir. 1988). Given these special features of venue, and Rule 12's additional language specifically requiring venue challenges to be raised by pretrial motion if possible, it is unsurprising that in *Ghanem* we declined to allow a defendant to seek dismissal of the indictment at trial based on a venue theory raised for the first time after the Government had rested. 993 F.3d at 1120–21. But that is a far cry from what the Government asserts here, which is that, by failing to seek pretrial dismissal of the indictment, Kirst is barred from arguing at trial that, under the correct view of the law, the Government failed to prove *an essential element of the offense* and he is therefore not guilty.

only on the ground that "[t]here has been no evidence presented that [Kirst] knowingly lied to obstruct an investigation, or that he was aware of his revoked status at the time that he flew the airplane." Because Kirst failed to argue that the NTSB investigation did not qualify as a "proceeding" involving the "administration of the law" within the meaning of 18 U.S.C. § 1505, we review this issue only for plain error. *See United States v. Lopez*, 4 F.4th 706, 719 (9th Cir. 2021) ("[I]t is well established that Rule 29 motions raising particular grounds fail to preserve appellate review of other grounds not raised. We review forfeited challenges to the sufficiency of the evidence for plain error." (citations omitted)); *see also* FED. R. CRIM. P. 30(d) ("A party who objects to any portion of the instructions . . . must inform the court of the specific objection and the grounds for the objection" and "[f]ailure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)"); FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). In my view, we therefore may review Kirst's insufficiency argument on appeal, but only for plain error.

## B

"To establish eligibility for plain-error relief, a defendant must satisfy three threshold requirements. *First*, there must be an error. *Second*, the error must be plain. *Third*, the error must affect 'substantial rights,' which generally means that

11

there must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (citations omitted). "If those three requirements are met, an appellate court may grant relief if it concludes that the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'" *Id*. at 2096–97 (citation omitted). Applying these standards, I would hold that the denial of Kirst's Rule 29 motion with respect to the § 1505 charge in Count 1 was plain error.

## 1

Addressing the first prong of the plain-error test, I conclude that, as a matter of law, the NTSB investigation undertaken here did not constitute a "proceeding" involving the "administration of the law" within the meaning of 18 U.S.C. § 1505.

By its terms, § 1505 imposes criminal punishment on anyone who, *inter alia*, "corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede *the due and proper administration of the law under which any pending proceeding is being had* before any department or agency of the United States." 18 U.S.C. § 1505 (emphasis added). I agree that an investigation, such as that conducted by the NTSB here, counts as a "proceeding" in the ordinary sense of that term. *See United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) ("An administrative investigation is a 'proceeding' within the meaning of 18 U.S.C. § 1505."); *cf. Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) (stating that

12

an "administrative proceeding" includes "an investigation, an audit, or other targeted administrative action").

However, § 1505 requires, not merely obstruction of a "proceeding," but obstruction of "the due and proper *administration of the law*" under which that "proceeding" is being conducted. 18 U.S.C. § 1505 (emphasis added). That additional phrase cannot be dismissed as surplusage. *See Jones v. United States*, 529 U.S. 848, 857 (2000) ("Judges should hesitate to treat statutory terms in any setting as surplusage, and resistance should be heightened when the words describe an element of a criminal offense." (simplified)). That is, Congress could have simplified the wording of § 1505 and made it a crime to obstruct "any pending proceeding" before an agency, but Congress instead more narrowly required that the defendant obstruct "the administration of the law" under which the proceeding is being conducted. The question, then, is whether the NTSB's investigation involved the "administration of the law" within the meaning of § 1505. The answer, in my view, is no.

Here, the "law" under which the NTSB investigation was conducted is Chapter 11 of Title 49 of the United States Code. *See* 49 U.S.C. § 1101 *et seq*. Specifically, § 1131 provides that the NTSB shall "investigate . . . and establish the facts, circumstances, and cause or probable cause" of any "aircraft accident" the NTSB "has authority to investigate under section 1132 of this title." *Id*.

13

§ 1131(a)(1)(a).  Section 1132, in turn, states that the NTSB "shall investigate . . . each accident involving civil aircraft."  *Id*. § 1132(a)(1)(A).  The specific tools for carrying out such an investigation are set forth in § 1113, which authorizes the NTSB to "conduct hearings to carry out this chapter, administer oaths, and require, by subpoena or otherwise, necessary witnesses and evidence."  *Id*. § 1113(a)(1).  The NTSB is also granted ancillary authority to enforce the subpoenas or orders it issues in connection with such an investigation, including the power to bring a civil action to enforce the subpoena or order, *id*. § 1113(a)(4), and to impose a civil penalty for disobedience, *id*. §§ 1151(a), 1155(a).

But conspicuously missing from the powers granted to the NTSB in this regard is any relevant authority for it to take any measures *beyond* investigation and reporting.  It cannot, for example, decide to impose any liability, penalty, or sanction on any person it finds at fault for an accident, nor can it issue any regulations prescribing changes in the conduct of aviation or of pilots.  *See Graham v. Teledyne-Con't Motors*, 805 F.2d 1386, 1389 (9th Cir. 1986) ("These investigations are not primarily for the purpose of determining civil liability; indeed, the [NTSB] has no authority to adjudicate the rights of private parties."); *see also* 49 C.F.R. § 831.4(c) ("NTSB investigations are fact-finding proceedings with no adverse parties.  The investigative proceedings . . . are not conducted for the purpose of determining the rights, liabilities, or blame of any person or entity,

14

as they are not adjudicatory proceedings."). The power to revoke airman certificates, for example, is instead lodged in the FAA, not the NTSB. *See* 49 U.S.C. §§ 44703, 44709, 44710. To be sure, the NTSB has been granted a *separate* authority to hear administrative appeals from such FAA revocations, *see id.* § 1133(1), and that distinct authority is the subject of the separate violation of § 1505 alleged in Count 2 of Kirst's indictment. But the obstruction alleged in Count 1 relates only to the NTSB's purely investigative authority, and under the statute, that power to conduct formal investigations is unaccompanied by any substantive regulatory enforcement authority *of the NTSB*. Indeed, the Government's evidence at trial confirms that the "proceeding" that underlies Count 1 was purely investigative and did not involve the exercise of any enforcement authority. As the Chief of the NTSB's Alaska Regional Office testified at trial, "We're not any kind of a regulatory agency. We're strictly accident investigators, and that's all we do." Another NTSB official confirmed that the NTSB "can't impose any kind of sanctions" and that "enforcement action[s]" are "done separately by the FAA."

Under these circumstances, I think it is clear that the NTSB's investigation of the accident did not involve the "administration of the law." Although *any* action of an executive agency might be thought of as involving "administration," *see Marinello*, 138 S. Ct. at 1106, the plain language of § 1505 requires that the

15

defendant obstruct, not the administration of an agency or its activities, but the "administration of the *law*" under which the proceeding is conducted. *See* 18 U.S.C. § 1505 (emphasis added). In ordinary usage, the word "administer" means "to direct or superintend the execution, use, or conduct of," *Administer*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981 ed.), which denotes a substantive authority to *carry out* the law. Here, the NTSB lacks any substantive authority to execute any laws in the sense that we ordinarily think of as involving the "administration" of the law. Accordingly, where the "proceeding" at issue is an investigation, § 1505 requires proof that the defendant obstructed the agency's *enforcement* of the law at issue in the investigation. *See United States v. Browning*, 630 F.2d 694, 699 (10th Cir. 1980) (holding that the "ultimate question" under § 1505 "is not whether the defendant told the truth but whether the defendant obstructed or interfered with the process of truthfinding in an investigation *in the process of enforcing the law*") (emphasis added). A "strictly investigative" proceeding by an agency that lacks relevant enforcement authority—*i.e.*, the power to prescribe relevant substantive rules or to impose liability or sanctions—cannot satisfy this requirement.

This reading of § 1505 accords with the Supreme Court's interpretation of similar language in other obstruction statutes. For example, the Court held in *United States v. Aguilar*, 515 U.S. 593 (1995), that "uttering false statements to an

investigating agent . . . who might or might not testify before a grand jury" does not "obstruct, or impede, the due *administration of justice*" within the meaning of 18 U.S.C. § 1503. *Id*. at 598, 600 (emphasis modified). Because the "administration of justice" refers to the actions of the courts or grand juries in executing the laws against specific persons, a defendants' acts of obstruction will violate § 1503 only if undertaken "with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some *ancillary proceeding*, such as an *investigation independent of the court's or grand jury's authority*." *Id*. at 599 (emphasis added). Here, the NTSB investigation is, at best, an "ancillary proceeding" that is "independent" of the FAA's "authority" to administer the law by taking enforcement action against Kirst.

Obstruction of *the FAA's* "administration of the law" does not count here, because the laws concerning the FAA's authority are not "the law *under which*" the relevant "pending proceeding is being had before" *the NTSB*. 18 U.S.C. § 1505 (emphasis added). Nor did the NTSB investigation serve as the basis for the FAA's subsequent enforcement action. The NTSB's investigative report was not issued until March 2017, nearly two years after the FAA moved to revoke Kirst's airman certificate in early 2015. The decision to take action to revoke Kirst's certificate was instead based on an "Enforcement Investigative Report" prepared by the relevant FAA "Flight Standards District Office." Thus, while the two

17

agencies collaborate and share information, the FAA undertook a substantial investigation of its own, including visiting the crash site (which the NTSB did not do) and performing its "own FAA analysis of the [GPS] device" that was the key item of evidence in the FAA's decision to revoke Kirst's certificate. Indeed, the record of the hearing before the ALJ that upheld the revocation confirms that the FAA's action was based largely on its own investigation by its own officials, and no NTSB official testified at that hearing. And at trial, both the NTSB witnesses and the FAA witnesses underscored that the two agencies had separate roles and independent decision-making authority. As the head of the NTSB's Alaska Regional Office testified, "FAA, NTSB have two different lanes, for the most part. We have a lane that we stay in, as far as accident investigation, and the FAA stays in their lane. They are more on the regulatory side. We are strictly investigative."

The Supreme Court's decision in *Marinello* further confirms that the majority's reading of § 1505 is wrong. Drawing on *Aguilar*, the Court in *Marinello* specifically rejected the view that every administrative action performed by the IRS counts as the "due administration of this title"—*i.e.*, the Internal Revenue Code—within the meaning of 26 U.S.C. § 7212(a). *See* 138 S. Ct. at 1105–06. The IRS possesses ample regulatory and enforcement powers in carrying out the Internal Revenue Code, and it is notable that *Marinello* limited § 7212(a) to the sort of "targeted acts of administration" by the IRS that could lead

18

the IRS itself to take enforcement action against those being targeted. *Id*. at 1106. By contrast, the NTSB—given its lack of any substantive enforcement or regulatory authority—was not engaged in "*administration* of the law" in the same way that the IRS was in *Marinello*. Given the similarities in language between § 1505 and § 7212, *Marinello*'s holding is "highly instructive for use as a guide toward a proper resolution of the issue now before us." 138 S. Ct. at 1109. Indeed, the Court in *Marinello* recognized that its interpretation "of § 7212 potentially overlaps with . . . § 1505." *Id*. at 1107.

None of the precedent invoked by the majority supports its position that an NTSB investigation is a proceeding involving the "administration of the law." Contrary to what the majority suggests, *see* Opin. at 25–26, we have never held that an agency's purely factual investigation, unrelated to any enforcement activity by that agency, qualifies as a "proceeding" involving the "administration of the law" under § 1505. In *Vixie*, we upheld a conviction under § 1505 for "submitting a false document in response to an Internal Revenue Service subpoena" issued under § 206 of the Economic Stabilization Act Amendments of 1971. *See* 532 F.2d at 1278. Under § 206, the authority to issue such subpoenas was granted to the "head of an agency *exercising authority under this title*." *See* Economic Stabilization Act of 1970, § 206, as amended, Pub. L. No. 92-210, 85 Stat. 743, 747 (1971), 12 U.S.C. 1204 note (1976 ed.) (emphasis added). Because the statute

19

at issue in *Vixie* thus granted the IRS substantive enforcement authority, the IRS's targeted investigative activities involved the "administration of the law" in a way that the NTSB's here did not. Likewise, we held in *United States v. Technic Services, Inc.*, 314 F.3d 1031 (9th Cir. 2002), *overruled on other grounds*, *United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc), that an Environmental Protection Agency ("EPA") "investigation into a possible violation of the Clean Air Act or Clean Water Act . . . is a kind of proceeding" under § 1505. *Id*. at 1044. In reaching this conclusion, we expressly noted that the investigation "could lead to a civil or criminal proceeding" by the EPA itself. *Id*. (citing 42 U.S.C. § 7413(b), (c); 33 U.S.C. § 1319(b), (c)). *Technic Services* thus also involved the "administration of the law" in a way that the NTSB investigation at issue here did not.

The majority also relies on the D.C. Circuit's opinion in *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994), but that decision does not support the majority's holding here. *Kelley* held that, because the Inspector General of the U.S. Agency for International Development is authorized to "issue subpoenas and to compel sworn testimony in conjunction with an investigation of agency activities," such an investigation has sufficient formality to count as a "proceeding" for purposes of § 1505. *Id*. at 1127. In reaching this conclusion, *Kelley* rejected the argument that, to qualify as a "proceeding," the activities in

question must *themselves* be "adjudicatory or rule-making activities." *Id.* I agree with *Kelley* on these points, as my discussion of *Vixie* and *Technic Services* makes clear. *See supra* at 19–20. But *Kelley* did not address the further question that is presented here, which is whether, for purposes of § 1505, the particular formal investigation that properly counts as a "proceeding" is one that is being conducted under "the law" that is being "administ[ered]." *See United States v. Corrales-Vazquez*, 931 F.3d 944, 954 (9th Cir. 2019) ("Cases are not precedential for propositions not considered." (simplified)). Moreover, *Kelley* distinguishes its holding from *United States v. Higgins*, 511 F. Supp. 453 (W.D. Ky. 1981), which it cites with a "cf." and describes as standing for the proposition that "because [the] FBI was not vested with rule making or adjudicative power relating to [the] subject of [an] indictment, its investigation was not a proceeding under § 1505." *Kelley*, 36 F.3d at 1127. The latter proposition, of course, is directly contrary to the majority's holding today.

For the foregoing reasons, I conclude that the NTSB was not engaged in the "administration of the law" within the meaning of § 1505 when it investigated Kirst's accident. Consequently, as a matter of law, Kirst's conduct as charged in Count 1 did not violate § 1505.

## 2

Turning to the second prong of the plain-error test, I believe that the error

here was plain. "[T]he Supreme Court has made clear that whether an error is 'plain' . . . is judged 'at the time of review' by the appellate court and *not* at the 'time of error.'" *United States v. Irons*, 31 F.4th 702, 713 (9th Cir. 2022) (quoting *Henderson v. United States*, 568 U.S. 266, 273 (2013)). Having found an error in answering the substantive question at step one, I must proceed to "assess, *with the benefit of hindsight*, whether [that] analysis reveals the question at issue to have a 'plain' answer or whether that analysis confirms that we have instead answered a close and difficult question." *Id*. Under that standard, I conclude that the above substantive analysis is sufficiently straightforward that the error is "plain."

**3**

Having concluded that the first two prongs of the plain-error test are met, the remaining requirements are also satisfied because, as a matter of law, Kirst's conduct in Count 1 did not violate § 1505. *See United States v. Olano*, 507 U.S. 725, 736 (1993) ("The court of appeals should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant."). Importantly, the Government does not contend that Kirst's failure to have raised his § 1505 argument sooner somehow prevented it from producing additional evidence at trial that might have cured the failure of proof. On the contrary, as the Government notes in the course of arguing that Kirst should have raised this argument before trial, the deficiency is inherent in the underlying facts and law,

22

and no amount of additional opportunity by the Government could have cured it.

Because all of the requirements for finding plain error have been met, I would reverse Kirst's conviction on Count 1.

### III

Because Count 2, by contrast, concerned a statement made in connection with Kirst's appeal of the FAA's revocation of his airman certificate, Count 2 was based on a distinct proceeding that *did* involve the "administration of the law" and that therefore fell within the meaning of § 1505. Moreover, to the extent that it applies to Count 2, I concur in the majority's analyses in sections II(B), (C), and (D) of its opinion, which reject Kirst's remaining arguments. I therefor concur in the affirmance of the judgment with respect to Count 2.

\*     \*     \*

Accordingly, I would reverse Kirst's conviction under Count 1 and remand with instructions to enter a judgment of acquittal on that count. I respectfully dissent to the extent that the majority concludes otherwise. I concur in the judgment to the extent that it affirms the conviction and sentence on Count 2.

23